Argued February 27, affirmed as modified September 24, 1952;
argued on rehearing March 3, affirmed on rehearing
November 25, 1953

## BERNARDS ET UX. *v.* LINK and HAYNES

248 P. 2d 341
263 P. 2d 794

*Albert T. Kemmer,* of Portland, argued the cause for appellants. With him on the brief were Allen G. Fletcher, of Portland, and James E. Burdett, of McMinnville.

*Eugene E. Marsh,* of McMinnville, argued the cause for respondents. On the brief were Marsh, Marsh & Dashney, of McMinnville.

Before BRAND, Chief Justice, and HAY, ROSSMAN and WARNER, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs from a decree which the circuit court entered in favor of the defendants in a suit which prayed that the title of the plaintiffs to a parcel of land described in the complaint be quieted. The parcel, which is approximately 200 acres in extent, is situated in Yamhill county.

The first assignment of error follows:

"The Court erred in holding that the Right-of-Way Deed conveyed a fee simple title to the Carlton & Coast Railroad Company."

With the exception of the part which is described in the right-of-way deed, the subject property is a farm. The part described in the right-of-way deed is

now a section of a logging road, but prior to 1941 or 1942 it was the roadbed of a logging railroad. The road begins at Carlton, crosses the plaintiffs' farm and runs to Tillamook Gate, a distance of about 15 miles.

Although the answer denies the averment of the complaint which alleges that the plaintiffs are the owners in fee of the 200-acre tract, the defendants concede that the plaintiffs own the entire property, with the exception of the area described in the right-of-way deed. In other words, only the title to the tract described in the right-of-way deed is in issue.

The plaintiffs admit that the right-of-way deed was executed and delivered by the persons who owned the 200-acre parcel at the time of execution and delivery. They also concede the validity of the deed. They, however, claim that the instrument granted only an easement and did not convey the fee. They also claim that the easement was extinguished when the right of way was converted from a railroad to a road. The defendants contend that the deed conveyed to its grantee, Carlton & Coast Railroad Company, the fee and also that if it granted only an easement, the latter has not been extinguished.

August 31, 1910, E. G. and Alice G. Freeman were the owners of the 200-acre tract which we have mentioned. Upon that day they, together with one Mary Geldard, executed and delivered to the Carlton & Coast Railroad Company, a corporation, an instrument which was entitled Right-of-Way Deed and which, in describing its subject matter, employed the following language:

> "Being a strip of land 60 feet in width, 30 feet on each side of the following described center line:
> "Beginning at a point * * *."

The evidence indicates that the "strip of land 60 feet in width" was about 2700 feet long.

The deed, apart from the description, follows:

## "RIGHT OF WAY DEED
### Alice G. Freeman & E. G. Freeman et al. to Carlton & Coast R. R. Co.

THIS DEED, Made on this the 31st day of August A.D. 1910 by and between Alice G. Freeman and E. G. Freeman & Mary Geldard, widow of Wm. Geldard, hereinafter called the grantors, and Carlton & Coast Railroad Company, an Oregon corporation, hereinafter called the grantee. WITNESSETH: That the said grantors for and in consideration of the sum of One Dollar ($1.00) received by said grantee, the receipt whereof is hereby acknowledged, do hereby grant, bargain, sell and convey unto the said grantee and unto its successors and assigns, for its use as a right of way for a railroad, a strip of land sixty (60) feet in width over and across and out of the land of the grantors in the County of Yamhill and State of Oregon, described as follows, towit:

(Description)

To be given one underground cattle crossing at least 8' wide 6'6" high one surface crossing 18' wide.

And the said Mary Geldard by joining in this deed, expressly releases the land hereby conveyed from any charge thereon which she may have for the payment of any money by any grantee of Wm. Geldard, now deceased, and releases and relieves the title to the land hereby conveyed, from any right of reversion therein or thereto, held by her and contingent on the breach of any condition thereon imposed by deed from said Wm. Geldard.

Also the following described pieces, towit:

(Description)

Said strip of land shall be taken substantially along the line as now surveyed and staked as a line

for a railroad by said grantee or its agents and servants, over and across said land, and it is agreed that said grantee shall build along said strip a railroad for passenger and freight service, on or before the first day of October, 1912, and should it fail so to build such railroad, this grant shall become null and void, and the title to said strip so conveyed shall revert to said grantors and their successors in interest.

TO HAVE AND TO HOLD the land hereby conveyed unto the said grantee and its successors and assigns forever, but subject to the provision for reversion hereinabove set out.

The said grantors do hereby covenant to and with the said grantee that the said strip of land hereby conveyed is free from any incumbrance, and that they will warrant and defend the title thereto unto said grantee, its successors and assigns as aforesaid. The grantee herein agrees that when said railroad is in operation it will build and keep in repair a good and substantial fence along each side of the strip of land hereby conveyed.

IN WITNESS WHEREOF, the said grantors have hereunto set their hands and seals.''

After delivery of the deed, the grantee, Carlton & Coast Railroad Company, constructed the railroad and prior to October 1, 1912, it began operations. Seemingly, at that time it was deemed a common carrier. Before long nothing was offered to the road except logs and a little lumber. In Carlton, which is one of the two termini of the road, a large sawmill operates. Likewise, at that point the road had a connection with the Southern Pacific Railroad. The other end of the road, as we have said, is near Tillamook Gate where there stands a large body of timber. The facts just mentioned account for the construction of the road. There is no contention that the grantee bound itself to operate as a common carrier.

By 1940 the Carlton & Coast Railroad Company became involved in financial difficulties, and January 13, 1940, a receiver was appointed for it. June 20, 1941, the receiver sold its assets to the Reconstruction Finance Corporation. July 28, 1942, that agency executed and delivered to the defendants a deed which conveyed to them "that certain right of way * * *" together with other items.

Immediately after the defendants received their deed they proceeded to improve the right of way. They operate a mill in Carlton and own timberland near Tillamook Gate. The improvements consisted of placing new stringers upon ten bridges and decking the latter for the accommodation of trucks. Fills were substituted for other bridges. The right of way of the railroad was converted into a road for logging trucks by replacing the ties and rails with a roadbed of gravel. At places the road was widened and at others turnouts were constructed. The defendants have hauled 25,000,-000 feet of logs annually since the commencement of their operations and own timberland contiguous to the road upon which stands 150,000,000 feet of timber. They permit others to use the road. From the testimony of one of the defendants the following is taken:

"Q  If Mr. Bernards wanted to have your trucks pick up some produce tomorrow, would you haul it?
"A  Yes."

The plaintiffs argue that the deed granted an easement and that the fee remained in the grantors. Upon the other hand, the defendants insist that the deed conveyed the fee simple title. The briefs submitted by the parties cite many decisions.

■ It will be observed from the deed that (1) it was entitled "Right of Way Deed"; (2) a conveyance of

the strip was made "for use as a right of way"; (3) the consideration was only $1.00; (4) the conveyance was subject to a condition subsequent which revested all title in the grantors in the event the stipulated condition occurred; (5) the grantees were required to construct for the use of the grantors a cattle crossing; (6) the description included the phrase "over and across and out of the land of the grantors"; (7) the phraseology employed repeatedly the term "strip of land"; (8) the grantee was required to "build and keep in repair a good and substantial fence along each side of the strip".

Various tests have been suggested by the commentators for facilitating a determination whether a deed like the one before us grants an easement or conveys the fee. See, for example, Restatement of the Law, Property, § 471, and Thompson on Real Property, Perm. Ed., §§ 459 to and including 462. We have given attention to all of the suggested tests.

*Wason v. Pilz,* 31 Or 9, 48 P 701, was a suit to quiet title to a tract 20 by 200 feet in area which was granted to one Schmeer by a deed which read:

"A parcel of land for the purposes of a road, twenty feet wide, across the center, running east and west over and across the following described real estate: * * * The said strip of twenty feet, so herein conveyed for a road as above stated, is to be inclosed by a good, substantial board fence by the said Peter Schmeer, and kept in repair by him."

The court experienced no difficulty in reaching the conclusion that the deed granted an easement only. It said:

"* * * The deed from John Schmeer to Peter Schmeer, under which Rudolph claimed, conveys

only an easement. The description is: 'A parcel of land for road purposes. * * * The said strip of twenty feet so herein conveyed for a road as above stated is to be inclosed,' etc. Language of similar import was held in Robinson v. Railroad Company, 59 Vt 426, (10 Atl. 522) to create an easement. In that case the estate was described as 'a strip of land four rods in width, across my land, and being the same land now occupied by the St. Albans and Richford Plank Road Company for their road, for the use of a plank road.' The words 'for the use of a plank road' seem to have been decisive of the estate carved out, although the deed otherwise purported to be an absolute grant. See, also, Sanborn v. City of Minneapolis (Minn.) 29 N. W. 126. So, in this case, the words 'a parcel of land for road purposes' are indicative of an easement only, and are controlling as the measure of the estate granted; * * *."

It will be observed that that decision construed the effect of a set of circumstances substantially similar to those now before us. In the case at bar, the dissimilarities are more indicative of an intention to grant an easement than to convey the fee. In view of that decision, we deem it unnecessary to set forth herein a review of the many authorities cited by the parties. We believe that the Wason decision is determinative of the issues under consideration and hold that the deed, which we have quoted, granted an easement. The grantors retained the fee.

The question remains as to whether the easement has been extinguished. The sole basis of the plaintiffs' claim of extinguishment is abandonment. Their brief says:

"The Railroad Company operated said railroad until it went into receivership in the early 1940's

when the Railroad Company abandoned its use of the 60-foot right-of-way easement over said farm and discontinued the operation of the common carrier railroad which it had operated for some 30 years.''

■ Since the owner of an easement possesses rights in the servient tenement, he may, if he chooses, extinguish them and thereby end the easement.

Powell on Real Property, § 423, says:

"* * * As the term suggests 'abandonment' means conduct of the easement owner manifesting an intent to exercise the easement no longer. Extinguishment of rights by bare abandonment is not common. * * *

"Assuming then that extinguishment by abandonment is recognized as to easements, it becomes necessary to determine what evidence can be used to base the conclusion of abandonment. The ultimate fact to be established is the intention to make no further use of the easement. Verbal expressions of this intention are not alone enough but help greatly in the interpretation of acts which might otherwise be equivocal. Two other varieties of evidence require consideration, (a) cessation of use; and (b) conduct inconsistent with an intention to use the easement further.

"It seems to be well settled that an easement created by a deed of grant, or otherwise by a writing, cannot be proved to have been extinguished by proof only of nonuser, no matter how long such nonuser may have continued. * * *

"The most important type of evidence on the question of abandonment consists of action by the easement owner inconsistent with his desire further to use the easement. Conduct which is equivocal in character does not suffice.''

According to Restatement of the Law, Property, § 504:

"An easement may be extinguished by an intentional relinquishment thereof indicated by conduct respecting the use authorized thereby."

In Comment (a), which follows the statement of that principle it is said:

"That there is an ownership ready to take the benefit resulting from an abandonment of an easement is the probable explanation of the tolerance of the law toward the abandonment of such interests. In many cases, of which the ownership of land in fee is an example, an abandonment, if permitted, would result in a void in the ownership of the affected thing, the filling of which would be largely a question of chance and would probably produce grave uncertainty of title. In such cases, abandonment, if permitted at all, is permitted only under rules stricter than those which prevail in the case of the abandonment of easements. * * *"

In Comment (c) it is said:

"An intentional relinquishment of an easement indicated by conduct respecting the use authorized by it constitutes an abandonment of the easement. The intention required in the abandonment of an easement is the intention not to make in the future the uses authorized by it. The benefit of an easement lies in the privilege of use of the land subject to it. There is no abandonment unless there is a giving up of that use. The giving up must be evidenced by conduct respecting the use of such a character as to indicate an intention to give up the use for the future as well as for the present. Conduct, when inconsistent with the continuance of the use, indicates an intention to give it up. The conduct required for abandonment cannot consist of verbal expressions of intention. Such expressions are effective to extinguish an easement only when

they comply with the requirements of a release and operate as such. Verbal expressions of an intention to abandon are relevant, however, for the purpose of giving meaning to acts which are susceptible of being interpreted as indicating an intention to give up the use authorized by an easement, but which do not of themselves conclusively demonstrate the intention which animated them.''

Illustration 6 to Comment (d) follows:

"A has a right of way for a logging railroad over Whiteacre, owned and possessed by B. He takes up the rails in order to log in another district, intending to replace them in a relatively short time. Because of depressed market conditions he makes no attempt to replace the rails for a period of ten years though he has always the intention to replace them as soon as market conditions are satisfactory. After ten years have elapsed A attempts to replace the rails. He is entitled to do so.''

Thompson on Real Property, Perm. Ed., § 700, says:

" * * * Land was conveyed to a railroad company for a right of way so long as the land should be used for railroad purposes. The way was graded. Afterwards the successor of the original company completed the road by a new route and refused to construct it on land conveyed. The grantor of the land conveyed for the right of way occupied it for five years after the completion of the road by the new route, and put valuable improvements upon it without objection from the railroad company. It was held that the right of way was abandoned and reverted to the grantor. The acts of the railroad company showed a clear intention to abandon the right of way. A right of way for a railroad through land, about midway between stations two or three miles distant, was granted by a deed which provided that if 'it should cease to be used and

operated as a railroad * * * this release shall cease to be operative, and the right of way granted thereunder shall terminate.' The grantee consolidated with a company, the track of which ran between stations referred to by a different route, and thereafter grantee's track was used only for storing cars. It was held that the right of way was forfeited. Evidence that a railroad was taken up, the rails and ties removed, the fences taken away, and a bridge across a river torn down, and all with a view of abandonment, is sufficient to show an abandonment of the easement of right of way; but, where a railroad company acquired title in fee simple to land for depot purposes, such land does not revert to the grantor on the railroad's abandonment of the use of the land for depot purposes. Where a street railway company had the right to lay a double track, operated its road for some years, and then abandoned one track, but relaid it after ten years, it was held that it had not lost the right to use both tracks. An easement created by deed is not defeated by mere nonuser. There must be in addition other acts by the owner of the dominant estate conclusively and unequivocally manifesting either a present intent to relinquish the easement or a purpose inconsistent with its further existence. * * * It has been held that the substitution of motor busses for electric street cars is not an abandonment of the car line's right of way over private property.''

Although the evidence is somewhat fragmentary, it does not show that the right of way was ever idle. If it was idle at all, the period could not have been longer than a few months. As soon as the easement was conveyed to the defendants they at once proceeded with their work of converting the logging railroad into a logging thoroughfare. It seems that while that work was progressing logging trucks operating upon the right of way brought logs into Carlton. Accordingly,

there can be no basis for a finding of complete non-user.

The evidence renders it clear that the defendants do not intend to resume use of the right of way for the operation of a logging railroad, but, to the contrary, intend to continue the operation of their logging road. The problem before us, when reduced to its final analysis, is this: Did the easement granted by the right-of-way deed of August 31, 1910, authorize the substitution of the logging road for its predecessor, the logging railroad. The plaintiffs do not claim that the logging road has subjected their property to any additional servitude. To the extent that there is any evidence upon the subject, it indicates that the strip of property involved in this suit is subjected to substantially the same amount of use which was made of it when the logging railroad was in operation.

The use of logging trucks and of logging roads has been an evolutionary development in the Northwest's logging industry. The present generation has seen that industry pass through a succession of cycles into the present one which depends materially upon logging trucks. When the forests were near the sawmills, the logs were brought to the mills by ox teams. Then, as the woodsman's ax made the forests recede from the mills and waterways, many logging railroads were built. Powerful cables and other equipment brought the logs to the outer terminus of the railroad. When the motor industry offered suitable trucks, they began to appear in the woods. They were flexible and could bring the logs to the desired place. With the extension of road building, some operators found it less expensive to run the loaded trucks to the mills or the log dump than to reload the logs upon railroad cars

at the outer extremity of the railroad and have the cars complete the journey. With that development, the supremacy of the logging railroad began to yield. Many loggers found it more economical to build logging roads than logging railroads. The latter has virtually no value except as junk when all of the timber has been cut, but a logging road can accommodate the vehicles of farmers as agriculture follows in the wake of the timber faller and eventually may be available as a public highway. Moreover, logging trucks which operate upon privately owned roads escape the taxes and traffic regulations exacted of vehicles which run upon public roads. In short, what has taken place upon the right of way in question has numerous counterparts. Improvements in trucks and the inexorable demand for lower cost of operation have made the logging road the successor to the logging railroad in divers places. Easements, which are one of the numerous instrumentalities by which the day's work is done, would thwart progress instead of facilitating it unless those who have easements can avail themselves of the newer and improved methods in the use of the easements.

It is pertinent to take note of a much quoted observation which was made in *Harvey v. Walters,* L R, 8 C P 166, 42 L J, C P 107, 28 L T 346. We now quote it:

"It appears to us that to hold that any, even the slightest, variation in the enjoyment of an easement would destroy the easement would virtually do away with all easements, as by the effect of natural causes some change must take place. Thus water percolating or flowing would produce some wear and tear and alter the height or width of the conduit; so would weather, alternations of heat and cold, &c. In the case of ancient lights, changes in the transparency of glass, wear and tear of

frames, growth of shrubs, &c., would produce effects which would vary the character of the enjoyment. In the user of a footpath the footsteps would never be on the same line or confined accurately to the same width of road. We are of opinion that the question here, as in *Hall v. Swift* and other cases, is whether there has been a substantial variance in the mode of or extent of user or enjoyment of the easement so as to throw a greater burden on the servient tenement. In the language of Sir Richard Kindersley, which was adopted by the Master of the Rolls in the case of *Heath v. Bucknall*, there must be an additional or different servitude, and the change must be material either in the nature or in the quantum of the servitude imposed.''

From the earliest of times the courts, in their construction of instruments which granted easements, have sought to discern and give effect in a practical manner to the purposes of the grant, with the result that the grantee in his enjoyment of the easement has never been restricted to the exact condition which existed when the grant was made. The leading authority is Luttrel's Case, 4 Rep 86, which was decided in 1601. The following, taken from that decision, refers at the beginning to the declaration filed in the case:

''the plaintiff, on the 4th of March in the 40th year of Elizabeth, was seised in fee of two old and ruinous fulling-mills, and that the time whereof, etc., magna pars aquae cujusdam ·rivuli ran from a place called Hod Weir to the said mills; and that for all the said time there had been a bank to keep the water within the current; and that afterwards the plaintiff, on the 8th October, 41 Eliz., pulled down the said fulling-mills, and in June, 42 Eliz., in place of the said fulling-mills erected two mills to grind corn, and said water ran to the said mills until the 10th September next following; and the same day defendants foderunt et fregerunt the bank, and diverted the water from his mills, etc.

"The defendants pleaded not guilty, and it was found against them, on which the plaintiff had judgment; upon which the defendant brought a writ of error in the Exchequer Chamber, on which two errors were assigned. The principal of these was, that, by the breaking and abating of the old fulling-mills, and by the building of new mills of another nature, the plaintiff had destroyed the prescription and could not prescribe to have any watercourse to grist-mills: 'As if a man grants me a watercourse to my fulling-mills, I cannot, as it was said, convert them to corn-mills, nec e contra.'
* * *

"It was contended in argument, that the alteration from fulling-mills to corn-mills might be injurious to the grantor, because he might have corn-mills himself, the proximity of others to which might injure him; and the principle was denied, that a man may preserve an easement by rebuilding on the same spot, and in the same manner, unless the previous destruction had been caused by some act of God, as by tempest or lightning.

"But it was resolved that the prescription did extend to these new grist-mills, for it appears by the register, and also by Fitz. Nav. Brev., that if a man is to demand a grist-mill, fulling-mill, or any other mill, the writ shall be general, de uno molendino, without any addition of grist or fulling. 21 Ass. 23, agrees of a plaint in assize; so that the mill is the substance and thing to be demanded, and the addition of grist or fulling is but to show the quality or nature of the mill; and therefore, if the plaintiff had prescribed to have the said watercourse to his mill generally (as he well might), then the case would be without question that he might alter the mill into what nature of a mill he pleased, provided always that no prejudice should thereby arise, either by diverting or stopping of the water as it was before; and it should be intended that the grant to have the watercourse was before the building of the mills, for nobody would

build a mill before he was sure to have water, and then the grant of a watercourse being generally to his mill, he may alter the quality of the mill at his pleasure as is aforesaid.

"So if a man has estovers, either by grant or prescription, to his house, although he alter the rooms and chambers of this house, as to make a parlour where it was the hall, or the hall where the parlour was, and the like alteration of the qualities, and not of the house itself, and without making new chimneys, by which no prejudice accrues to the owner of the wood, it is not any destruction of the prescription, for then many prescriptions would be destroyed; and although he builds a new chimney, or makes a new addition to his old house, by that he shall not lose his prescription, but he cannot employ or spend any of his estovers on the part newly added,—the same law of conduits and water-pipes and the like. So, if a man has an old window to his hall and afterwards he converts the hall into a parlour, or any other use, yet it is not lawful for his neighbour to stop it, for he shall prescribe to have the light in such part of his house.

"And although in this case the plaintiff has made a question, forasmuch as he has not prescribed generally, but particularly to his fulling-mill, yet forasmuch as in general the mill was the substance, and the addition demonstrates only the quality, and the alteration was not of the substance, but only of the quality or name of the mill, and that without any prejudice in the watercourse to the owner thereof, for these reasons it was resolved that the prescription remained."

The English courts, far from restricting the holding in Luttrel's Case, have expanded it. A recent instance is *The Attorney General v. Reynolds* (1911) 2 K B 888. In that case, according to a headnote:

"The destruction of an ancient house, to which rights of common of estovers and turbary were

appurtenant, does not necessarily operate as an abandonment of those rights. The rights may be enjoyed as appurtenant to a new house erected in continuance of the ancient house, provided that no greater burden is imposed upon the servient land. The question whether the new house is or is not in continuance of the ancient house is a question of fact. In order to be a continuance of the ancient house it is not necessary that the new house should be built upon the foundations of the ancient house.''

We now quote from the decision itself:

"" * * * That is using the very language of *Luttrel's Case.* (4) It is quite true that in *Luttrel's Case* (5) the Court said 'it ought to be upon the same place, which was the old foundation of the old house'; but I do not think that necessarily means that it must essentially be so. No doubt it ought in the interests of the commoner himself, because the more it is on the old foundation the less need there will be to try a case about it; but I do not think that the Court intended to resolve that there can be no continuity unless there is identity of site, nor do I think that the figurative language about the soil being the most perdurable part of the house can be pressed to import that the identity of the site is an essential part of the identity of the messuage. However, the right might be expressed in the grant, I think it is reasonable to assume that the grant should be read in favour of the grantee of a right appurtenant to a house then existing or to a new house in continuance of the same. What continuity may be is another matter; that is a question of fact. I do not think it is limited to identity of site. Contiguity is no doubt a good test of continuity, and I daresay that any considerable remoteness in the new building would, unless there were modifying circumstances, go far to destroy the continuity. But as soon as it is conceded, as the ancient cases establish, that when the house falls

down it may be re-erected and still be for this purpose the same house, so that the right is still appurtenant to it, I think it follows in reason that it may be re-erected, not necessarily on the same foundation, but somewhere in the same place to supply the place of the old house, as Lord Hatherley says, and in continuance of the old house and the exercise of the old right. * * * ''

We quoted extensively from the foregoing decisions because they state the timetested principles which govern the case at bar. Presumably all who grant easements are familiar with those principles. It remains only to take notice of their practical application in controversies like the present one. Of course, the fundamental rule is to give effect to the meaning of the grant. In ascertaining its meaning, as we have seen, a reasonable interpretation is placed upon its terminology, but reasonable men always look back at what was done before.

■ Although the owner of a right of way over land of another is limited in his use of the right to the terms of the grant, yet it is settled that the grantee may avail himself of modern improvements which will enable him to enjoy more fully the rights which were granted. In other words, in determining the meaning of the grant, it will be inferred, in the absence of express language to the contrary, that the grantee is not restricted to the methods of use which were current at the time of the grant. We shall now take notice of a few of the decisions upon this phase of the controversy.

From *Diller v. St. Louis, S. & P. R. R.,* 304 Ill 373, 136 NE 703, we quote:

" * * * A reservation of a right of way entitles the one who has the right to adapt it to the improvements of the age."

In *Matteodo v. Capaldi,* 48 R I 312, 138 Atl 38, 53 ALR 550, the court said:

"Respondents having an unlimited right of passage for vehicles, did the mere fact of use of the way by an automobile add to the burden on complainant's premises? Atty Gen. v. Hodgson, 91 L. J. Ch. N. S. 426, at page 431, 11 B. R. C. 234, is the only case to which we have been referred. In that case, the use of a motor vehicle was held permissible upon a granted right of way for carriages; and under such grant a motorcar was a carriage, said the court. This view seems to us to be sound. Where one is granted a vehicular right of way, he is not restricted as a matter of law to such vehicles as are in common use at the time of the grant. It matters not whether he be transported on horseback, by oxcart, by horse and wagon, or by motor vehicle. The method of propulsion of the person using the way is not the test by which to determine whether an added burden has been placed upon the servient estate."

From *Strycker v. Richardson,* 77 Pa Super Ct 252, we take the following:

"This grant was not for a lifetime, nor for a term of years, but for all time; and, although stated as a right of way for 'teams and wagons,' it is inconceivable that the right to use the way should cease to exist if, in the development of the means of transportation, teams and wagons should be wholly supplanted by another although similar type of vehicle, provided, of course, the easement continued to be used as originally contemplated, i. e., as a roadway. A wagon has been defined as a vehicle moving on wheels and usually drawn by horses. The word 'wagon' is a generic term and includes other species of vehicle by whatever name they may be called. An automobile is a vehicle propelled by power generated within itself, used to convey passengers or materials, and in a general sense is a wagon. * * * No particular kind of

carriage or wagon is mentioned. Although automobiles had not been invented at the time the easement was created, yet the language of the grant is unrestricted, and can be held to include any vehicle on wheels then or thereafter used."

*Diocese of Trenton v. Toman,* 74 N J Eq 702, 70 Atl 606, says:

"This brings us to the third ground upon which the complainant rests its bill, namely, that the servitude extends only to horsedrawn vehicles, and that the word 'carriage way', as used by the parties to the conveyance, does not admit of an 'automobile way.' To this proposition I am unable to assent. The words 'carriage way,' and 'wagon or carriage alley' are those in the deed designating the use to which the alleyway may be put. No particular kind of carriage or wagon is mentioned. Although automobiles had not been invented at the time the easement was created, yet the language of the grant is unrestricted, and must be held to include any vehicle on wheels then or thereafter to be used. A 'carriage' is defined to be 'that which carries, especially on wheels; a vehicle.' 5 Am. & Eng. Ency. of Law (2d Ed.) p. 157."

*From Swensen v. Marino,* 306 Mass 582, 130 ALR 763, 29 NE2d 15, we quote:

"* * * Three of the five ancient deeds mentioning the right of way refer to passing 'with teams and other ways' or use equivalent words. We should be very slow to hold that even ancient rights of way, not expressly restricted as to the type of vehicle (Clarkin v. Duggan, 292 Mass. 263, 198 N.E. 170), could not be employed at all for the means of transportation in common use by a succeeding generation."

*Dillon v. Moore,* 270 App Div 73, 54 NY Supp2d 833, [reversed on other grounds, 296 NY 561] pointed out:

"The grant of the rights of way did not limit the use thereof to horses and wagons which were

the mode of conveyance at the time the grant of the easement was made. When automobiles and trucks supplanted horses and wagons as a mode of conveyance and travel, the plaintiff, her patrons and tradesmen and the other holders of rights of way, traveled over the right of way with automobiles and trucks. There is no evidence that this increased the burden upon the owner of the servient estate.''

In *McDonnell v. Sheets,* 234 Iowa 1148, 15 NW2d 252, 156 ALR 1043, the contested easement was established by a grant reading as follows:

''Grantors guarantee to the grantee, or her assigns, the privilege of ingress and agress to the rear of her property, with team and wagon, in such manner as grantors may from time to time designate over their land.''

In announcing its interpretation of the words just quoted, the court said:

'' * * * It is our construction that the words team and wagon did not amount to a restriction on the type of vehicle or traffic.''

It will be observed that in all of the decisions from which we just quoted the courts, without citing Luttrel's Case, construed the grants of the easements in substantially the same way as in that early English case. They gave effect to the instrument as the grant of an easement to be used as a way and felt that terms such as ''carriage'', ''wagon or carriage'' and ''team and wagon'' were not intended to restrict the use of the way to vehicles of that kind when better ones became available. They deemed that the words were merely the current way of expressing the type of the easement which the parties had in mind.

We come now to *Kansas Electric Power Co. v. Walker,* 142 Kan 808, 51 P2d 1002, 102 ALR 387, in

which the rights under review concerned a strip of land 20 by 279 feet in Lawrence, Kansas. The plaintiff in the case, the Kansas Electric Power Company, operated over the property, in part, a transportation system. The defendant had executed and delivered to the plaintiff the deeds out of which the plaintiff's rights arose. The transaction concerning the grant was expressed in more than one deed. One of the deeds contained this term: "to build and maintain a good and sufficient fence both sides of the right of way hereby conveyed." Another included this clause: "In the reconstruction of its line of street railway, the grade and alignment of its tracks shall be in accordance with the profile shown by * * *." After the receipt of its deeds, the plaintiff constructed streetcar tracks upon the strip and operated upon them electric streetcars until 1933 when it removed the ties and tracks. Concurrently with their removal the plaintiff put the property in condition for the operation upon it of gasoline-driven motor busses and thereupon operated conveyances of that kind upon the strip. Shortly after it had done so the defendant erected barriers at both ends of the strip, claiming that the plaintiff had abandoned its easement when it discontinued using the property for the operation of a street railway system. At that juncture, the plaintiff instituted suit for an injunction. In the trial court the plaintiff presented testimony showing that busses made greater noise and vibration than streetcars. The trial court entered findings holding that "the change from a streetcar line to a motorbus method of transportation did not constitute an abandonment of the passageway." It granted

the injunction for which the plaintiff had prayed. In affirming that decree, the decision under review said:

"In the case of Anderson v. Knoxille Power & L. Co. 16 Tenn. App. 259, 64 S. W. (2d) 204, 205, the plaintiff was an abutting owner whose grantor had conveyed a twenty foot wide right of way to the street car company 'so long as the same is used for railway purposes, otherwise to revert to the grantor, his heirs or assigns.' He asked for an injunction against the company, which had changed from operating an ordinary street car line to a trackless trolley, the land being through a loop where the plaintiff owned land on both sides of the right of way, which loop was five miles from the downtown part of Knoxville, and plaintiff complained of the two trolley wires instead of one and possibly guy wires and other changes, and it was held: 'Changing from regular street cars to "trackless trolleys" and construction of concrete slab on right of way held not abandonment of use thereof for "railway purposes," within deed containing reversion clause.'

\* \* \*

"Appellants complain of the added noise, vibration, and pedestrian and automobile travel as an additional burden which the defendants as original owners never agreed to permit and should not now, as abutting owners, be compelled to endure when such was not contemplated when the deeds were executed. Eliminating the matter of additional travel, for which neither party is wholly responsible, the additional noise and vibration found by the court is not such an element as should wholly hinder and prevent the taking of a forward or progressive step, so recognized by the general public, when not in itself injurious or destructive."

The above will suffice as a review of analogous cases.

It is our duty to endeavor to discern and give effect to the intention which the grantors and the grantee

had when the deed of August 31, 1910, was executed and delivered. In discerning their intention, we must view the language of the deed in substantially the same way as similar instruments have been viewed by the courts since 1601, when Luttrel's Case was decided.

■ The evidence renders it clear that the paramount purpose of the parties was to enable the grantee to bring to Carlton, over the right of way described in the deed, the logs which were being produced near Tillamook Gate. In 1910, as we have pointed out, logging railroads were the only means by which logs were transported long distances. Horse-drawn vehicles, two score of years ago, far outnumbered automobiles, and motor trucks were a strange sight. None of them was capable of carrying logs. "Right of way for a railroad" was the current way of expressing the intention of the parties; that is, to grant a way upon which the grantee could bring logs into Carlton. To have said "right of way for a logging road" would have been meaningless, for such roads did not exist. When the parties entitled the deed "Right of Way Deed" they indicated, in a measure, that it was the way in which they were interested rather than the instrumentality which would operate upon the way. In 1910 Diesel motors were unknown. Today they are found frequently, not only in the motive unit of railroads, but also in motor trucks. Thus, the use of Diesel motors has narrowed the gap which differentiates locomotives from trucks.

When we construe the meaning of the parties, we must endeavor to place ourselves in their position and that cannot be done effectively without retreating in time about two score of years. In granting to the Carlton & Coast Railroad Company an easement upon

which it could construct a transportation facility for the chief purpose of hauling logs, we do not believe that the grantor intended to restrict the grantee to the specific type of equipment which was then in use. Had that been the grantor's purpose, the railroad could not have kept its equipment abreast of the developments that have taken place in locomotives and also in logging cars. We know of no reason for believing that the grantor intended to restrict the grantee to the specific type of roadbed which was employed in 1910. The parties included in the deed a condition subsequent whereby the easement would be extinguished if a railroad, equipped to render both passenger and freight service, was not built by October 1, 1912 (*O. R. & N. Co. v. McDonald*, 58 Or 228, 112 P 413), but they did not bind the grantee to maintain that type of service thereafter. We think that the deed bound the grantee to construct a railroad, but that it permitted the grantee, as long as it used the easement, to keep abreast of the developments of the times and, accordingly, conclude that when it became more economical to convert from a railroad to a logging road, the grantee was at liberty to do so.

The circuit court held that the contested deed conveyed the fee. We do not so construe it. We believe that it did no more than grant an easement, the terms of which we have expressed above.

The cause is remanded to the circuit court with instructions to enter an appropriate decree.

### On Rehearing

*Albert T. Kemmer,* of Portland, argued for appellants. With him on the brief was Norman N. Griffith, of Portland.

*Willard L. Cushing,* of McMinnville, argued for respondents. With him on the brief was Marsh, Marsh & Dashney, of McMinnville.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, BRAND and PERRY, Justices.

AFFIRMED ON REHEARING.

ROSSMAN, J.

Due to the two-fold reason that the issues in this appeal are important and that *Powers v. Coos Bay Lumber Company,* this day decided by us, was appealed at about the same time that our decision in the instant case was announced, we granted the plaintiffs-appellants' petition for a rehearing.

As the principal support for their contention that our previous decision erred, the brief filed by plaintiffs-appellants cites: *Tamalpais Land & Water Co. v. N. W. Pacific R. Co.,* 73 Cal App 2d, 917, 167 P2d 825; *Robertson v. Bertha Mineral Co.,* 128 Va 93, 104 SE 832; *Potomac Edison Co. v. Routzahn,* 192 Md 449, 65 A2d 580; *Mammoth Cave Natl. P. Assn. v. State Highway Commission,* 261 Ky 769, 88 SW2d 931; *Norton v. Duluth Transfer R.,* 129 Minn 126, 151 NW 907; *Home Real Estate Co. v. Los Angeles Pacific Co.,* 163 Cal 710, 126 P 972.

The defendants-respondents, in support of our decision, has called our attention to: *Dand v. Kingscote,* 6 Mees. & W. 174, 151 Eng. Reprint 370; *Dowgiel v. Reid,* 359 Pa 448, 59 A2d 115; *Hodgkins v. Bianchini,* 323 Mass 169, 80 NE2d 464; *Kain v. Norfolk,* 1949, Ch. 163; *Newcomen v. Coulson,* L. R. 5 Ch. Div. 133.

We have given careful attention to the authorities above mentioned, and the entire case has once more

received earnest consideration. We believe, however, that our previous opinion is free from error. In pronouncing that view, we do not discern any necessity for setting forth herein analyses of the above authorities.

We adhere to our former decision.