Submitted on record and briefs November 22, 1995, remanded in part with instructions; otherwise affirmed April 17, petition for review allowed August 27, 1996 (324 Or 176)

Mark TIPPERMAN,
dba McCoy Meadows Ranch,
*Appellant,*

*v.*

William TSIATSOS
and State of Oregon,
by and through the
Department of Fish and Wildlife,
*Respondents.*

(93-12-35919; CA A86086)

915 P2d 446

Mark Tipperman filed the briefs *pro se* for appellant.

Steven J. Joseph and Joseph & Mendiguren filed the brief for respondent William Tsiatsos.

Phillip Schradle, Assistant Attorney General, waived appearance for respondent State of Oregon.

Before Deits, Presiding Judge, and De Muniz and Haselton, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

Plaintiff brought this declaratory judgment action to construe an easement on property located in Union County. We review *de novo*. ORS 19.125(3).

The easement was reserved in a 1909 deed executed by the Ayres, previous owners of part of the property now owned by defendant Tsiatsos (defendant).[1] Defendant's family acquired the benefitted property in 1929. Plaintiff purchased the land burdened by the easement in 1990. As pertinent, the easement provides:

> "Reserving, however, out of the said last described tract of [175 acres] * * * the right to use the waters of Meadow Creek flowing through the same for stock water for stock of the grantors and their assigns pasturing on adjacent lands, and the right of free access for said stock to said waters over said lands."

From 1986 through 1991, Earle and Dorothy Meisener owned or leased the property now owned by plaintiff. In 1987, the Meiseners entered into a lease with the State of Oregon that authorized the erection of a fence in the riparian area of Meadow Creek. Under the terms of that lease, livestock are prohibited from grazing in the riparian area.

In the spring of 1988, before the fence was erected, defendant met at Meadow Creek with Earle Meisener (Meisener) and Willie Noll, a representative of the Oregon Department of Fish and Wildlife (ODFW) to discuss the water gap in the riparian fence. At that meeting, defendant objected to the width of the gap, and it was widened. In August 1988, defendant had a conversation with Noll about a possible change in the gap. Noll told defendant to work it out with Meisener, but defendant did not get back to Noll. The fence was completed in the fall of 1988.

At the time plaintiff purchased the property, there was a fenced corridor that provided stock with access from defendant's land to the water gap in Meadow Creek. The corridor is on an old road and follows a natural contour of the

---

[1] The State of Oregon did not appear on appeal.

land. It provides the most direct access from defendant's land to the creek. In the fall, the metal panels that comprise the water gap are removed to prevent icing, and the gap is closed to livestock access.

In 1991, the original water gap was damaged by flood, and in 1992 ODFW planned to move part of the fence to a higher elevation. Plaintiff mailed defendant a notice of the fence relocation and the access that would be provided to the water gap. Defendant did not respond, and ODFW verified that there was no response before proceeding with the relocation of the fence. Before 1992, defendant did not express any objection to the water gap to any owner of the property burdened by the easement.

The trial court entered a judgment declaring, *inter alia,* (1) that the easement "was reserved and exists for the benefit of a livestock operation on the Benefitted Land"; (2) that, except for conditions relevant to spring calving and fall round-up, the livestock that could have access to Meadow Creek were limited to "150 head of cows &/or calves, 8 bulls and 5 horses" or a total of 163 "head of any mix of livestock * * * year round"; and (3) that plaintiff was to construct and maintain at his expense a second corridor fence leading to a second water gap to be constructed by plaintiff and/or the state.

Before turning to plaintiff's challenge to those portions of the judgment, we consider his assignment that the court erred because it concluded that "harm to the natural resources on Plaintiff's land was irrelevant to the Court's decision." We do not agree with that characterization of the trial court's position. The court declined to determine the rights of the easement on the basis of "environmental issues," which it stated were not in its "jurisdiction." However, the court clearly considered relevant the rights of plaintiff to enhance the riparian area.[2] Insofar as plaintiff's assignment of error is that we should find the evidence relevant, we agree, and have considered it.

---

[2] The court stated:

"[A]s I said the other day, it's reasonable for the owner of this property to in this day and age, * * * to be able to fence off a riparian area and protect his property ecologically for good husbandry for everybody."

■　We consider plaintiff's first and fourth assignments of error together. He assigns error to the court's finding that defendant did not acquiesce in the location of the easement and to its order that plaintiff construct and maintain a second water gap. In the construction of easements, the fundamental principle is to discern the purposes of the grant and to give effect to them in a practical manner. *Bernards et ux. v. Link and Haynes*, 199 Or 579, 593, 248 P2d 341 (1952), *on rehearing* 199 Or 605, 263 P2d 794 (1953). When the language of the instrument is clear, that language, and only that language, decides the easement's limits. *Minto v. Salem Water Etc. Co.*, 120 Or 202, 210, 250 P 722 (1926). However, when the grant is indefinite, the location of the easement may be shown by the first location and use of the easement, *Powers et ux. v. Coos Bay Lumber Co.*, 200 Or 329, 391, 263 P2d 913 (1954), or it may be subsequently fixed by an implied agreement arising out of the use of a particular way for a long time by the benefitted party and acquiescence in that use on the part of the burdened party. *Cullison et al. v. Hotel Seaside, Inc.*, 126 Or 18, 22, 268 P 758 (1928). Relocation of a specified easement may be made by mutual consent, which may be implied. *Ericsson v. Braukman*, 111 Or App 57, 61, 824 P2d 1174, *rev den* 313 Or 210 (1992).

■　We agree with the trial court that the purpose of the easement here was to reserve water rights for a cattle operation in favor of the benefitted party. However, plaintiff is correct that the grant is "ambiguous" insofar as it "does not locate by metes and bounds or otherwise, the specific portion of the burdened property over which the defendant's livestock will be afforded access to Meadow Creek." The location of the easement, thus, may be determined either by historical use or by subsequent agreement.

■　Plaintiff contends that there is evidence to show that the historical use was limited to the existing access of the one corridor. Plaintiff relies primarily on his personal observations made before and after his purchase of the property. However, those observations were made after construction of the riparian fence. Defendant, whose family has owned the benefitted property since 1929, testified that historically the livestock had unlimited access to about 2,000 frontage feet of Meadow Creek. We are persuaded that previous use of the

easement gave cattle unrestricted access to the waters of Meadow Creek.

■ Despite that historical access, however, defendant does not argue that the extent of the easement is established by that access. Rather, defendant recognizes that an easement and the servient land are subject to adjustment with changing circumstances. *Jones et ux v. Edwards et ux*, 219 Or 429, 435, 347 P2d 846 (1959). He contends that the court's resolution properly applied a balancing test to the benefits and burdens of the easement in the light of current ranching and ecological concepts, even though the court's resolution limits the language of the easement that reserved to him "the right of free access for said stock to said waters over said lands."

Plaintiff argues, however, that defendant agreed that the easement would be limited to the one corridor. Plaintiff contends that defendant's acquiescence may be implied from his conduct in failing to object when the riparian fence was built and for almost four years after. Our review again persuades us otherwise.

Defendant testified that he was "going to stick with my water rights and what the deed implies," and his actions were consistent with that claim. At the time of the meeting between Meisener, Noll and defendant, the entire riparian fence had been staked. Defendant's failure to object is indeed some evidence of his acquiescence in the limited access. However, acquiescence to the use of a particular location on the part of a grantor must be "for a long time." *Cullison*, 126 Or at 23. In *Cullison*, the claimed right of way was used from 1883 until 1924. *See also Beck v. Lane County*, 141 Or 580, 18 P2d 594 (1933) (disputed access had been used for more than 17 years). The evidence here does not show long-term acquiescence in access restricted only to the new corridor and water gap.

When defendant met with Meisener and Noll, defendant voiced objections, although Noll thought that the only real conflict was to the size of the water gap. Noll testified that defendant's position was that he "needed some access to the water for his livestock, what was adequate for him," and that the gap was widened because of defendant's objection.

However, Noll also testified there was no discussion of water rights, and no discussion of other water gaps within a quarter mile. Noll also testified that defendant contacted him while the fence was being built, and contacted him "numerous times" after, sometimes to indicate his unhappiness with the fence or the water gap.

In the spring of 1991, defendant also voiced objections to the fence to Mark Lacy, a fish biologist for the Bureau of Land Management. In May 1992, plaintiff, defendant, Lacy, and Noll met at the site to try to resolve the issue. Lacy testified that at that meeting defendant commented on the "long historical use of that particular site by stock."[3] We cannot agree with plaintiff that the evidence shows "subsequent silence and inaction over a period of four years" on defendant's part so as to constitute acquiescence in limiting the easement to the new water gap.

■■ Plaintiff argues that the court had no authority to require a second water gap:

> "Under the governing case law any material adverse change in the degree of use will be considered unreasonable and prohibited. In no case cited [in plaintiff's brief] has a Court held that creation of a second means of access or a second point of access is permissible. It was unreasonable for the trial court to provide for the creation of a second corridor, further dividing the burdened property, funneling livestock into a water gap substantially downstream from the existing water gap, and enhancing the prospect for damage to the riparian and other resources on the burdened property."[4]

We recently summarized general principles applicable to conflicts between the burdens and benefits of easements:

> "An easement owner is limited to those uses of the easement that are reasonably necessary for the easement's intended purpose. *State Dept. of Fish and Wildlife v. Kortge*, 84 Or App 153, 158, 733 P2d 466, *rev den* 303 Or 534 (1987).

---

[3] Before that meeting, defendant had cut a fence to gain access to plaintiff's property.

[4] Plaintiff argues that defendant did not ask for a second corridor. However, in addition to specific relief, defendant's answer sought "[s]uch other and further relief as the court may deem equitable."

The owner of the servient estate also has a right to make reasonable use of his or her land, *Ericsson v. Braukman*, 111 Or App 57, 62, 824 P2d 1174, *rev den* 313 Or 210 (1992), and his or her rights and those of the dominant tenant are mutually limiting. *Chevron Pipe Line Co. v. DeRoest*, 122 Or App 400, 445, 858 P2d 164 (1993), *mod* 126 Or App 113, *rev den* 319 Or 80 (1994). On the other hand, easements are burdensome by their very nature, and the fact that a given use imposes a hardship upon the servient owner does not, in itself, render that use unreasonable or unnecessary. Ultimately, whether or not a particular use or act is reasonably necessary depends upon the factual circumstances of each case. *Jewell v. Kroo*, 268 Or 103, 106, 518 P2d 1305 (1974); *Miller v. Georgia-Pacific*, 48 Or App 1007, 1016, 618 P2d 992 (1980)."

*Tooker v. Feinstein*, 131 Or App 684, 687-88, 886 P2d 1051 (1994), *mod and adhered to* 133 Or App 107, 889 P2d 1356, *rev den* 321 Or 94 (1995).

Those principles call for balancing the rights of both owners. That is what the court did.[5] The purpose of the easement was to allow defendant's stock access to Meadow Creek, and that original access was unrestricted. The "material change" that resulted from the construction of the riparian fence was adverse to *defendant's* degree of use. However, rather than require continuation of that unlimited access, the court devised an arrangement that allows the owner of the burdened estate to adjust to changing ecological circumstances while continuing to meet the purpose for the easement. Under these facts, the court did not exceed its authority in requiring a second corridor. We find no reason to disturb that requirement.

■ Plaintiff argues that the court erred in requiring plaintiff to bear the cost of construction and maintenance of the second corridor and second water gap. The riparian fence

---

[5] The court stated:

"And obviously, at this point in time, it's reasonable that the burden of the easement on this land not include the grazing of all the grass off of it. Somehow, somehow the benefited property has to get the cattle through that land to water with the least reasonable use of the land in between. In other words, it seems to me the establishment of some two corridors to the creek in some manner, some manner that both parties can live with and use—and get the maximum use of the property, is what has to happen."

has restricted the previous unlimited access of the stock to Meadow Creek, and we agree that plaintiff should bear the cost of construction of the corridor and that plaintiff and/or ODFW should bear the costs of the water gap. However, the costs of maintaining both corridors are the obligation of defendant. As relevant, ORS 105.175 provides:

> "(1)   The holders of an interest in any easement shall maintain the easement in repair.
>
> "* * * * *
>
> "(3)   The cost of maintaining the easement in repair in the absence of an agreement and in the absence of maintenance provisions in a recorded instrument creating the easement shall be shared by each holder of any interest in the easement in proportion to the use made of the easement by each holder of an interest in the easement."[6]

Under that statute, defendant, as sole holder of the easement, is responsible for maintenance.

■   Plaintiff also argues that the court erred by disregarding applicable rules of construction when it concluded that 150 cow/calf pairs and other livestock could use the easement. He argues that the reservation is to be construed as narrowly as possible against the grantors, defendant's predecessors in interest. However, an exception to that general rule is in the *reservation* of an easement. A reservation is drafted by the grantee and is construed in favor of the grantee. *Verzeano v. Carpenter*, 108 Or App 258, 263, 815 P2d 1275 (1991), *rev den* 312 Or 589 (1992).

Plaintiff argues, however, that the court allowed defendant to overburden the easement by allowing up to 163 head of livestock to use the easement. His position rests on the term "pasturing." He argues that access is reserved only for stock "pasturing" on the benefitted land that, he contends, consists of 100 acres.[7] He argues that the evidence shows that

---

[6] ORS 105.180(1) provides that ORS 105.175 applies to "all easements existing on or created after January 1, 1992[.]"

[7] The deed refers to "adjacent land*s*" in the plural, not land in the singular. We are not as persuaded as is plaintiff that the parties thereby meant only 100 acres. However, because of our resolution, we need not determine the acres that comprise the "adjacent lands."

defendant operates a feedlot for livestock on his property and that he wants access to the creek for that livestock, which does not come within "pasturing."[8] Plaintiff points to nine dictionary definitions to support his argument that "pasturing" must be defined as stock feeding on grass growing on the land. He contends that it is uncontradicted that there is not enough grass on the acreage here to nourish more than 10 cows and 10 calves and then only during the five-month grazing season. Defendant responds that the term "pasturing" may be read to incorporate the changing circumstances of stock production, which the court recognized.[9]

The deed reserves to the grantor "the right to use the waters of Meadow Creek * * * for stock water for stock of the grantors * * * pasturing on adjacent lands * * *." In construing the term "pasturing," we consider its context and the purpose of the easement, and we place a reasonable interpretation upon the terminology with consideration as to what was previously done. *See Bernards*, 199 Or at 597. In the absence of a contrary intent, the uses of both the dominant and servient owners are subject to adjustment consistent with the normal development of their respective lands. *Jones*, 219 Or at 435.

When we construe the meaning of the parties to the easement, we must endeavor to place ourselves in their position. *Bernards*, 199 Or at 603. Here, we have noted our agreement with the trial court that the purpose of the easement

---

[8] Defendant testified that, in open winters, cattle might graze on his property, but that he also grazes his cattle in more than one place, and then winters them at the benefitted property where they are fed.

[9] The court ruled:

"[F]or me or this court to lock on to a term pasturing and limit it—limit this water right in that—into a narrow definition by picking on that one word would not be facing reality.

"Obviously, over the years, I'm sure in 1909 or whatever, that wouldn't have been a problem. Every cow that got water out of that stream would have probably been pasturing during some point of the year on this land.

"But then we have evolved, as I said, through the years. The cattle operation changed and cattle are now moved here and moved there and things just change. But when cattle are on this property, it seems to me it's clear they have a right to water out of this creek.

"Now you can't—having said that, you can't put 20,000 head of cattle on that property and water them out of that creek. It's got to be some reasonable amount of cattle and that, I would say, is not in excess of 150 head of cows."

was to provide water for a stock operation. Placing ourselves in the positions of the parties to this easement, we do not believe that they intended that only practices involved in such operations that were in existence in 1909 could ever apply to the easement. *See id.* at 604 (grantor did not intend to restrict grantee to a railroad but intended that the grantee could convert the easement to a logging road to keep abreast of the developments of the times). Rather, we believe that both the grantor and grantee would have contemplated adjustments in the use of both the benefitted and burdened estates to meet changing circumstances. Those adjustments would permit plaintiff to restrict the "right of free access" by construction of riparian fencing and would allow defendant to use water from the creek for his stock being wintered on the benefitted land.

Remanded with instructions to amend judgment to provide that defendant Tsiatsos shall bear the sole responsibility for maintenance of both corridors; otherwise affirmed.