Argued and submitted September 15, 1998, judgment reversed and remanded in part; otherwise affirmed March 31, petition for review denied June 22, 1999
(329 Or 10)

CENTRAL OREGON FABRICATORS, INC.,
an Oregon corporation,
and Jack Rhoden,
*Respondents,*

*v.*

Alan HUDSPETH,
Barry Hudspeth
and F & M Realty Company, Inc.,
an Oregon corporation,
*Appellants.*

(95-3546; CA A99398)

977 P2d 416

Thomas W. Sondag argued the cause for appellants. With him on the briefs was Lane Powell Spears Lubersky LLP.

Gregory P. Lynch argued the cause for respondents. With him on the brief were Stanley D. Austin and Hurley, Lynch & Re, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

Defendants appeal from a judgment quieting title to 24,000 acres of land in favor of plaintiffs and extinguishing an express *profit a prendre*[1] granting defendants the right to hunt and fish on plaintiffs' property. On *de novo* review, ORS 19.415(3), we agree with defendants' principal contention that the trial court erred in concluding that defendants had abandoned their rights or, alternatively, that those rights had been extinguished by way of adverse possession. We further agree, in part, that the trial court erroneously construed the scope of defendants' rights under the deed. Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

On August 7, 1964, Hudspeth Land and Livestock Company and Hudspeth Sawmill Company executed a deed conveying more than 24,000 acres of land in Wheeler County (the "Bald Mountain property") to plaintiff Central Oregon Fabricators, Inc. (COF). On the same day, and immediately after executing the deed, Fred Hudspeth, one of the principal owners of the Hudspeth companies, asked plaintiff Jack Rhoden, principal owner of COF, if he and his family could continue to hunt on the land. Rhoden agreed, and COF, for a payment of $10 and "other good and valuable consideration," subsequently executed a deed granting 11 individuals rights to hunt and fish on the Bald Mountain property. Among the grantees were defendants Alan and Barry Hudspeth and Fred Hudspeth, the predecessor-in-interest of defendant F & M Realty Company, Inc. (F&M).[2] That deed, which is the focus of this dispute, provided that COF

---

[1] A *profit a prendre* is a species of easement that gives the holder or grantee an "interest in the land itself" and the right to enter the land of the servient owners to sever or remove things previously constituting part of the land. *Jackson County v. Compton,* 289 Or 21, 24, 609 P2d 1293 (1980). As the court explained in *Bingham v. Salene,* 15 Or 208, 212, 14 P 523 (1887):

"The property in animals *ferae naturae,* while they are on the soil, belong to the owner of the soil, and he may grant a right to others to come and take them, by a grant of hunting, shooting, fowling, and so forth. * * * [S]uch a grant is a license of a *profit a prendre.*"

The same general rules governing easements govern profits. *Jackson County,* 289 Or at 24.

[2] The grantees also included Rhoden, his brother Lee, and John Crawford, Jack Rhoden's partner in COF.

"does hereby grant, bargain, sell and convey unto said Grantees, their heirs and assigns, and personal guests while accompanying the Grantees, the right, privilege, and easement to shoot, kill and take away wild fowl, including but not limited to wild duck, pheasant, grouse, sage hen, quail and other birds of every kind and nature; and wild game, including but not limited to deer, antelope and elk; and to fish in streams and ponds, all of which may be upon the following described real property, or in any and all lakes, and sloughs, and waters situated, lying and being upon said lands lying within Wheeler county, Oregon, as described [as the Bald Mountain Property]."

The deed did not include a limitation on duration but provided, instead, that the conveyance was "to have and to hold said rights granted unto said Grantees, their heirs and assigns, and personal guests while accompanying the Grantees * * *."

Immediately after COF acquired the Bald Mountain property in 1964, Rhoden began constructing fences and trenches around the perimeter of the property, putting locked gates on all access roads, and employing guards to patrol the property during hunting season.

In 1989, Rhoden individually acquired an undivided one-half interest in the property from the trusts of the heirs of his former partner, John Crawford. That conveyance was explicitly "subject to" defendants' and the other grantees' rights under the 1964 hunting deed.[3]

At about the time that Rhoden acquired his one-half interest in the property, he and his sons began operating a hunting recreation and guide service on the property, Bald Mountain Recreation, Inc., which charged hunters a fee of up to $5,000 per person for a five-day guided hunting trip. In operating that business, Rhoden modified the cattle and logging practices on the property in ways designed to enhance hunting. For example, Rhoden put out food and planted additional grass to encourage elk to come onto the property and

---

[3] In 1969, 1988, and 1993, COF entered into various other transactions conveying interests in some portion of the Bald Mountain property. Each was "subject to" or "subject to and excepting" rights granted defendants under the 1964 deed.

reduced the number of cattle to compensate for the increase in elk.

From 1964 until the trial in 1997, defendant Barry Hudspeth and Fred Hudspeth, F&M's predecessor in interest, never exercised their rights to hunt or fish on the property. Only defendant Alan Hudspeth attempted to exercise rights under the 1964 deed. In 1968 or 1969, Alan hunted on the property after telling Rhoden his plans. In 1974, Alan again told Rhoden that he planned to hunt on the property; however, after Rhoden told him that there would be several other paying hunters in the area, Alan decided to hunt on other land that he owned.

In October 1988, Rhoden invited his grandchildren to hunt on a portion of the Bald Mountain property that had been conveyed to a neighbor. Todd Rhoden, one of Rhoden's grandsons, brought his friend, Todd Hudspeth, who was Alan's son, with him. Jack Rhoden told Todd Hudspeth that he could not stay and hunt. When Todd's grandfather, Fred Hudspeth learned what had happened, he directed his attorney to send Rhoden a copy of the deed, and an explanation of the rights it granted, so as to make it "perfectly clear that the rights existed and to restate the rights so that no one would forget them." Rhoden never responded to that letter. However, he later apologized to Alan Hudspeth about the incident.

In August 1994, Alan Hudspeth approached Rhoden at a golf course and told him that he would like the keys or combinations to the locked gates so that he could hunt during the upcoming season. Although the testimony at trial was disputed, Rhoden apparently told Alan that he did not want him hunting on the land because he had paying hunters coming. After that conversation, Rhoden went home and examined the 1964 deed. He became quite concerned after reading the deed and called his attorney for advice because he believed that the wording granted a broad right to hunt, and he could see that, "with the number of people that they might want to bring * * * because th[e] deed left it wide open for them to bring anybody," that it could "screw up" all the property.

In early 1995, Barry and Alan met with their mother, Margaret, to discuss the hunting and fishing rights. Although their father, Fred Hudspeth, had died in 1992, the probate of his estate remained open. The hunting and fishing rights had not been included on the personal property inventory. At Barry's direction, an amendment to the inventory was filed, adding the rights under the 1964 deed, and Margaret inherited those rights. In exchange for forgiveness of a debt, Margaret subsequently assigned her rights to F&M. Thereafter, F&M explored selling its rights to Rhoden but, when that was rejected,[4] F&M and Barry began developing a plan to sell memberships to hunt on the property by assigning the rights on an annual basis to the members.

In September 1995, plaintiffs filed this action to quiet title, alleging that defendants had abandoned their rights under the 1964 deed or, in the alternative, for declaratory relief, seeking a declaration that defendants' rights under the deed were strictly personal and not "subject to commercialization, sale, or profit taking." Defendants answered that their rights had not been abandoned and were freely alienable. Defendants also counterclaimed, seeking a declaration of the parties' rights under the deed and an injunction against plaintiffs' interference with those rights.[5]

Following a trial to the court, the court issued extensive written findings and conclusions. In those findings, the court first addressed plaintiffs' alternative claim for declaratory relief and determined, *inter alia,* that: (1) "any assignment [of rights under the deed] can only be to a natural person"; (2) "[a]ny assignment * * * cannot be divided, multiplied or assigned to more than one natural person"; (3) "the grant to the Hudspeths is limited to hunting during the season for the particular game mentioned"; and (4) a "guest cannot be a commercial guest, only a non-paying personal guest."

---

[4] Defendants presented evidence that, at the time of trial, all of the named grantees, other than defendants and John Hudspeth's heir, had sold or otherwise conveyed their rights under the deed to Rhoden. The trial court excluded evidence of those transfers under OEC 408 as evidence of compromise of a disputed claim. On appeal, defendants do not dispute that ruling.

[5] Defendant Alan Hudspeth separately alleged a counterclaim for intentional infliction of emotional distress. The trial court entered judgment against that counterclaim, and that disposition is not challenged on appeal.

With respect to plaintiffs' principal claim of abandonment, the court determined that defendants' nonuse of the property after 1964, coupled with their failure to object to plaintiffs' action in fencing, gating, and patrolling the property and excluding uninvited guests, evinced an abandonment of the property by no later than 1988. The court further and alternatively determined that defendants' interests were extinguished through adverse possession:

"The Court finds that the Plaintiffs adversely possessed the Defendants' hunting rights. An interest in property, either in whole or in part, can be adversely possessed if the party satisfies the elements of adverse possession. The servient estate *can* adversely possess a right to use the property away from the dominant holder. *Simpson v. Fowles,* 272 Or 342[, 536 P2d 499] (1975). The party must show that possession is (1) open, notorious and a hostile claim of right as against others; (2) continuous; (3) exclusive; and (4) the property was held for the statutory period of time, *i.e.* ten years. Although this legal theory was not claimed by the Plaintiffs, the Court believes that under the broad claim of declaratory judgment, the Court can make a finding regarding this theory to adjudicate the rights of the parties.

"It is clear that after the August, 1964, conveyance, Plaintiffs fenced the property, gated and locked the property and patrolled the property in a manner open and notorious to all others. It is clear that Plaintiffs prohibited all parties, except permitted guests, from going onto the property. Plaintiffs also managed all incidents of ownership in Bald Mountain, including the hunting rights, to the exclusion of all others. Finally, Plaintiffs' exclusivity of ownership was continuous for well over ten (10) years and most definitely during the hunting season."

The court subsequently entered a judgment that incorporated its findings and dismissed defendants' counterclaims.

On appeal, defendants raise six assignments of error. Three of those assignments relate to plaintiffs' first claim and the court's declaration that defendants' rights under the deed were extinguished. Specifically, defendants assert that the court erred in: (1) finding that defendants intended to abandon their rights under the deed and in quieting title in plaintiffs on that basis (first assignment); (2) granting relief on the basis of adverse possession, a theory

that was neither pleaded nor argued to the court (third assignment); and (3) even if that theory was properly before the court, determining that defendants' rights were extinguished by adverse possession (fourth assignment). Defendants' second and sixth assignments of error challenge the dismissal of their counterclaims for declaratory relief and injunctive relief. Finally, defendants' fifth assignment challenges the trial court's declaration of the parties' putative rights under the deed in the four particulars described above. 159 Or App at 397.

■ We turn to the first assignment of error challenging the trial court's determination of abandonment. In *Abbott v. Thompson,* 56 Or App 311, 316, 641 P2d 652, *rev den* 293 Or 103 (1982), we explained that the party claiming abandonment must show *both* nonuse *and* "either [a] verbal expression of an intent to abandon or conduct inconsistent with an intention to make further use." With respect to the second element, "conduct which is equivocal in character does not suffice." *Bernards et ux v. Link and Haynes,* 199 Or 579, 587, 248 P2d 341 (1953) (quoting Powell, on *Real Property* ¶ 423).[6] Rather, "[t]he intent to abandon must be clear and it must be accompanied by some specific act of abandonment." *Rich v. Runyon,* 52 Or App 107, 113, 627 P2d 1265 (1981).

Here, the trial court stated:

"The Defendants, Fred, Alan and Barry Hudspeth, have made no attempt to use the property pursuant to the hunting rights since the conveyance in August, 1964. They did not hunt or fish on the property for approximately thirty (30) years. The only exception to this non-use was in 1968 or 1969, when Alan Hudspeth hunted on Bald Mountain, [with] Jack Rhoden's *permission.*

"In addition to Defendants' non-use, Jack Rhoden began to fence the Bald Mountain property shortly after the August, 1964 conveyance. He placed locks and gates on the property and intensely patrolled the property during hunting season. He kept all parties, other than invited guests, off the property and did not allow anyone to hunt elk until somewhere between 1989 and 1990. Rhoden continued this action each year thereafter. [Defendants] failed to limit the

---

[6] Now 3 Powell, on *Real Property* § 34.20 (1997 ed).

"Plaintiffs' actions, which were totally inconsistent with their hunting rights. Defendants' failure to curb Plaintiffs' actions continued from the time of the August, 1964 conveyance through 1994. Due to the extensive non-use and the other factors listed above, the Court finds that [defendants] have abandoned their hunting and fishing rights."

Defendants do not dispute the trial court's finding of the first required element, nonuse. They argue, however, that plaintiffs failed to prove that defendants intended to abandon their rights through evidence of either "a verbal expression" of such an intention or "conduct inconsistent with an intent to make further use." *Abbott,* 56 Or App at 316. Specifically, defendants contend that the trial court erroneously relied on *plaintiffs'* comments and conduct as proof of *defendants'* intent. Thus, defendants reason, the court's reference to Rhoden's conduct was inapposite unless defendants' expressions or actions in response to that conduct demonstrated an unequivocal intent to abandon their rights. Defendants assert that their silence or inaction—their "failure to limit" and "failure to curb" those actions—did not satisfy that standard and that the court erred in concluding otherwise.

We agree with defendants that plaintiffs failed to prove that defendants intended to abandon their rights under the 1964 deed. We so conclude for two related reasons. First, as a matter of law, defendants' passivity or acquiescence was, without more, insufficient to demonstrate an intent to abandon. Second, Rhoden's conduct in developing the Bald Mountain property's hunting and fishing potential and in excluding trespassers was not inconsistent with—and, indeed, enhanced—defendants' own interests. Thus, defendants' "failure to curb" those activities cannot be deemed to be inconsistent with retention of their rights.

As noted, the trial court concluded that the alleged abandonment occurred by no later than October 1988, before the incident involving Todd Hudspeth, and plaintiffs do not contend otherwise. The parties' only interactions pertaining to the property between 1964 and 1988 were in 1968 or 1969, when Alan Hudspeth hunted at Bald Mountain, and in 1974, when Alan told Rhoden he would like to hunt on the property but ultimately hunted elsewhere. Neither of those incidents

involved Fred or Barry and, thus, could not be probative of their intent.

■ The only evidence of those events was Alan's testimony; Rhoden denied that the first had ever occurred[7] and had no memory of the second. With respect to the incident in 1968 or 1969, Alan testified at trial as follows:

"Q. Now, prior to going up there, you made arrangements with Mr. Rhoden to go, didn't you?

"A. I called him, and I told him I was going to go up there, and he said, 'Check in at the gate.' See, they had both ends locked. The gate I went through was off the Service Creek Road.

"Q. Did you ask his permission to go up there?

"A. No, I didn't. I told him I was going up there.

"Q. You did?

"A. Yes, I did.

"Q. Oh, okay. And were all the gates locked?

"A. The main gate was locked. I didn't go clear through to the Richmond Road, but the main gate off of Service Creek Road was locked with a watchman there, and he let me through.

"Q. Okay. And what specifically did you say to Mr. Rhoden about going up there in '68 or '69?

"A. I told him I was going up to go hunting."

In an effort to impeach Alan's testimony that he had not asked for Rhoden's permission, plaintiffs' counsel referred to excerpts of Alan's deposition:

"Q. Did you talk to Mr. Rhoden before going up there in '68 or '69 about hunting on that property?

"A. I must have notified somebody because they let me through the gate on the logging road.

"Q. Who's they?

---

[7] The trial court, in finding that Alan had hunted on Bald Mountain in 1968 or 1969, necessarily found Rhoden not credible on that point.

"A. The man that was the guard at the gate at the time.

"Q. Who was it that let you through?

"A. I can't tell you who it was.

"Q. Do you have an independent recollection of having contacted Mr. Rhoden and *asking permission* to go up and hunt on that piece of property?

"A. No, I don't.

"Q. But your recollection is you think you did?

"A. *I think I did because, as I say, they let me through the gate.*"

The italicized language is the sole basis for the trial court's determination that Alan "had hunted on Bald Mountain [with] Jack Rhoden's *'permission,'*" (emphasis in original) and, in so doing, had evinced the unequivocal intention to abandon his rights. Even assuming that Alan's deposition testimony materially contradicted his explicit trial testimony,[8] Alan's conduct in 1968 or 1969 was, at best, "equivocal in character." Hunting on the property cannot be deemed an abandonment of the right to hunt on the property. Obtaining consent does not *unequivocally* evince the relinquishment of the right to act without consent. Certainly, Rhoden, who denied that Alan had ever hunted on Bald Mountain after 1964, did not attribute such significance to the alleged "permission."

With respect to the second, 1974, incident—which the trial court did not discuss—Alan testified:

"Q. * * * And when was the next time, if ever, that you either hunted or attempted to hunt besides 1968 or 1969 on the Bald Mountain property?

"A. Okay. I called Jack in 19 — either '74 or '75 or —

"Q. '74 or '75?

---

[8] As defendants note, plaintiffs' counsel, not Alan, used the term "asking permission" and, in the context of Alan's ultimate response, he could well have understood that term as shorthand for "calling ahead," especially given the potential danger. As defendants comment, "[I]t is, after all, *hunting* that is involved here." (Emphasis in original.)

"A.    Something like that. I can't remember because it was in my deposition, I believe. And I told him that I would like to take a guest up there, and he told me and said, 'I wish you wouldn't. I've got — in that area you might be in I've got all kinds of paid hunters going to be in there.'

"Q.    Are you talking about '94 or —

"A.    '75 or '74.

"Q.    1974?

"A.    That is correct, sir.

"Q.    I see. Okay.

"A.    And he said, 'I wish you wouldn't.' At the time my uncle still owned, or had just passed away at Rudio Mountain, and we went to Rudio Mountain, the friend, myself and Todd Post, instead of up onto Bald Mountain because Jack had asked me. He was going to have all these paid hunters in there and just it would be better for him if I didn't this year. I said, 'Fine.' So I didn't. I didn't really intend to bother him because I had someplace else to go."

That testimony, which is uncontroverted, shows only that Rhoden asked Alan not to hunt on the property at that time and that Alan, who had made other plans to hunt, acquiesced in that request. Nothing more.

█    We thus conclude that plaintiffs failed to prove that defendants either verbally expressed their intent to abandon their rights under the 1964 deed or engaged in conduct that was clearly inconsistent with those rights. *See, e.g., Abbott,* 56 Or App at 316. Plaintiffs presented no proof, beyond evidence of mere nonuse, pertaining to Barry and F&M, and their proof as to Alan's conduct and intent was so equivocal as to be insufficient. Defendants' acquiescence in Rhoden's actions was not inconsistent with retention of their rights. Accordingly, the trial court erred in concluding that plaintiffs had abandoned their rights and in quieting title on that basis.

Defendants next assign error to the trial court's *sua sponte* determination that plaintiffs acquired title in fee simple by adverse possession, a theory that plaintiffs never pleaded or argued. Plaintiffs respond that the court properly

addressed adverse possession because defendants' counter-claim, which generally sought a declaration of

> "the interests, rights, and obligations of the parties in and to the property * * *, the nature of the rights granted to Defendants under the Deed, * * * and the terms and manner under which Defendants' rights may be exercised, utilized, assigned, or transferred,"

at least implicated that issue.

■    We agree with defendants that the trial court erred in granting plaintiff relief on an unpleaded theory. Plaintiffs never pleaded a claim for adverse possession; they never sought leave of the court to amend their pleadings to conform to any proof of adverse possession, *see* ORCP 23 A; and they never otherwise contended that adverse possession was somehow apposite.[9] Nor did defendants' counterclaim for declaratory relief implicitly raise the issue. *See, e.g., Hurlbutt v. Hurlbutt,* 36 Or App 721, 585 P2d 724 (1978), *rev den* 285 Or 73 (1979) (reversing declaratory judgment awarding property interest on theory of constructive trust, where theory pleaded was one of resulting trust). Thus:

> "The trial court was in error in *sua sponte* opting for a * * * theory which was not pled. In law or equity, a decree or judgment must be responsive to the issues framed by the pleadings and a trial court has no authority to render a decision on issues not presented for determination." *Id.* at 725.

*See also Bidiman v. Gehrts,* 133 Or App 145, 151, 890 P2d 436, *rev den* 321 Or 512 (1995) ("In the absence of a successful motion to amend [the] pleading or evidence that defendant impliedly consented to try the case on a theory different than what [plaintiff] had pled, the trial court correctly granted defendant's motion for a directed verdict.").[10] Thus, the trial

---

[9] In their memorandum in opposition to defendants' motion for summary judgment, plaintiffs cited *Simpson v. Fowles,* 272 Or 342, 536 P2d 499 (1975), which involved extinguishment of an easement through adverse possession. Plaintiffs did not, however, contend that that basis for relief was applicable here.

[10] *Cf. State Dept. of Fish and Wildlife v. Kortge,* 84 Or App 153, 159, 733 P2d 466, *rev den* 303 Or 534 (1987) (where grantees pleaded that they owned the disputed property in fee simple by adverse possession but failed to plead or argue, in the alternative, that they had acquired a prescriptive right to exclude the general public, they could not raise a prescriptive right theory for the first time on appeal).

court erred in granting relief on the basis of adverse possession. Given our disposition with respect to abandonment, we reverse the judgment quieting title in plaintiffs in fee simple and declaring the deed void.[11]

We turn to defendants' fifth assignment, which contests the trial court's construction of the 1964 deed and consequent declaration of the parties' rights and interests under the deed.[12] Defendants assert that the trial court erred in concluding that: (1) rights under the deed could be assigned only to "natural persons" and that any such assignment could not be to "more than one natural person"; (2) the hunting rights pertained only to the types of animals specifically identified in the deed; and (3) "personal guests" under the deed do not include persons who pay to hunt.

■ In *Tipperman v. Tsiatsos,* 327 Or 539, 964 P2d 1015 (1998), the court described the legal principles governing the proper construction of an instrument creating an easement by express grant. Because easements and profits are governed by the same general rules, 159 Or App at 393 n 1, in construing the 1964 deed, we first "declare the meaning of what is written in the instrument" and look beyond the wording to the intent of the original parties "only where there is an uncertainty or ambiguity." 327 Or at 544-45. Moreover, as we recently explained:

> "In giving effect to an easement's purpose, general principles of reasonableness control. Ordinarily, an easement passes no rights to the grantee except those rights that are necessary for the easement's reasonable and proper enjoyment. Similarly, the grantor retains 'full dominion and use of the land [subject to an easement], except so far as a limitation of the grantor's right is essential to the fair enjoyment' of the easement that was granted." *Watson v. Banducci*, 158 Or App 223, 231, 973 P2d 395 (1999), *quoting Miller v. Vaughn*, 8 Or 333, 336 (1880) (citations omitted).

---

[11] Because of that disposition, we need not address defendants' fourth assignment of error, which asserts that the evidence was insufficient to support a determination of adverse possession.

[12] As noted, the trial court first construed the deed and then determined that defendants' rights had been extinguished by abandonment or adverse possession.

Defendants first contend that the phrase "to grantees, *their heirs and assigns*" (emphasis added) is unlimited both as to the nature and the number of potential heirs and assignees. In particular, defendants contend that, under the deed, grantees may assign their interests to entities as well as to natural persons and that hunting rights may be assigned to more than one individual or entity. Defendants are correct that that language, viewed in isolation, is broad. *See, e.g., Sunset Lake v. Remington,* 45 Or App 973, 977, 609 P2d 896 (1980) (refusing to limit or restrict the term "assigns" after looking at the definition of "assigns" as "one to whom a right of property is legally transferred," and "generally comprehends all those who take * * * under the assignor, whether by conveyance, devise, descent or act of law"). However, the context of the deed compels a narrower construction. In particular, the deed refers to "personal guests" of the grantees—and at least implicitly by extension—of their heirs and assigns. People, individuals, have *personal* guests.[13] Entities don't. Moreover, to the extent that any ambiguity remains, our assessment of the "circumstances existing at the time of the grant or easement," *Tipperman,* 327 Or at 544, particularly, including the discussion between Fred Hudspeth and Jack Rhoden, persuades us that assignees under the deed must be "natural persons." The trial court correctly so construed the deed.

■ Conversely, nothing in the deed's language or surrounding circumstances compels the construction, endorsed by the trial court, that any grantee's interest cannot be assigned to more than one person. Thus, the trial court erred in holding that "[a]ny assignment * * * cannot be divided, multiplied or assigned to more than one natural person." Nevertheless, we emphasize that a proliferation of assignments, impinging on the grantors' right to make reasonable use of the property, would exceed the scope of the easement.

---

[13] *Webster's Third New Int'l Dictionary*, 1686 (unabridged ed 1993) defines "personal" as:

"**1:** of or relating to a particular person: affecting one individual or each of many individuals: peculiar or proper to private concerns: not public or general * * * **2a:** done in person without the intervention of another: direct from one person to another: originating in or proceeding from a single person * * *; * * * **4:** relating to an individual, his character, conduct, motives or private affairs esp. in an invidious and offensive manner * * *."

*See, e.g., Ericsson v. Braukman,* 111 Or App 57, 64, 824 P2d 1174, *rev den* 313 Or 210 (1992).

■     Defendants next assert that the deed's language, "including but not limited to," followed by a list of the types of game that may be hunted, grants the right to hunt types of game other than those specifically listed. Defendants are correct. The plain language of the deed "clearly contemplates" that the rights extend to wild game other than those expressly listed. *See State ex rel Juv. Dept. v. Ware,* 144 Or App 614, 616, 927 P2d 1114 (1996) (holding that "including but not limited to" language in a statute granting the juvenile court authority to impose conditions of probation "clearly contemplate[d]" that the juvenile court could impose conditions "other than those expressly listed in the statute").

■     Finally, defendants assert that the term "personal guests" in the context of the deed encompasses both paying and nonpaying guests, as long as they accompany the grantee or the grantee's successor in interest. Plaintiffs challenge that construction, asserting that "[a] purchaser of a hunting pass would be more accurately described as a business invitee rather than a personal guest." We agree with plaintiffs. "Personal guest" in common usage has a noncommercial connotation. Moreover, to the extent that that term could ever be understood, dubiously, to refer to paying customers or clients, such a construction cannot be squared with the circumstances surrounding the granting of the profit. We thus sustain the trial court's construction of the deed in that regard.

Finally, defendants' second and sixth assignments of error challenge the trial court's disposition of their first counterclaim for declaratory relief and their second and fourth counterclaims for injunctive relief. The court dismissed those counterclaims as "moot," as being effectively resolved by its determination that defendants' rights under the deed had been extinguished. Given our reversal of that determination, we reverse the dismissal of those counterclaims and remand for reconsideration of those counterclaims in light of this opinion.

Judgment declaring August 7, 1964, deed void and quieting title in favor of plaintiffs reversed; judgment dismissing defendants' first, second, and fourth counterclaims reversed and remanded for further proceedings; otherwise affirmed.