Argued and submitted June 2, 1998, affirmed in CA A97433; reversed in CA A98289 February 3, 1999

James L. WATSON,
Diana Escola, and Watson Escola Partners,
*Appellants,*

*v.*

James A BANDUCCI
and Robert Banducci,
*Respondents,*

*and*

Mary Jane BANDUCCI,
Deceased.
*Defendant.*

(93CV-0701CC; CA A97433)

James L. WATSON
and Diana Escola Watson,
*Appellants,*

*v.*

James A. BANDUCCI,
*Respondent,*

*and*

Mary Jane BANDUCCI,
Deceased.
*Defendant.*

(93CV-0994CC; CA A98289)
(Cases Consolidated for Opinion Only)

973 P2d 395

Jeffrey L. Pugh argued the cause and filed the briefs for appellants.

John R. Huttl argued the cause for respondents Robert Banducci and James Banducci. With him on the briefs was Frohnmayer, Deatherage, Pratt, Jamieson, Clarke & Moore, P.C.

Before DeMuniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

In a consolidated trial to the court on two actions,[1] the Watsons (plaintiffs) sought damages and injunctions on claims arising from a dispute with the Banduccis (defendants), their neighbors, over an express easement that allows plaintiffs to enter and leave their property over a roadway on defendants' land. The dispute centers on the interpretation of the easement's terms. More specifically, the dispute involves whether defendants' construction of two internal gates, and the locking of one of those gates, violates the easement or, if not violative, whether those acts unreasonably interfered with plaintiffs' use and enjoyment of the easement. Plaintiffs appeal from judgments in each case. We affirm in part and reverse in part.

The following facts are taken from the testimony and exhibits offered at trial, and are, except as noted, undisputed. In 1947, the Modes (defendants' predecessors in interest) granted their neighbor Edgar Solle (plaintiffs' predecessor in interest) the following easement, which connected the otherwise landlocked Solle property to the county road:

"[W]e, S.R. MODE and LOIS MODE * * * for and in the consideration of ONE DOLLAR * * * do hereby grant unto said Edgar Solle an easement for a gateway road thirty (30) feet in width, being fifteen (15) feet on each side of the following described center line * * *.

"* * * * *

"THIS EASEMENT is granted upon the condition that Edgar Solle maintain suitable cattle-guards wherever said road crosses through any line fence of the grantors, and that said cattle-guards be always maintained in good condition and be so constructed as to prevent the passage of any livestock thereover; and that said road be maintained by and at the sole expense of Edgar Solle, his heirs and assigns, for his use and the use of the public. In the event

---

[1] Although plaintiffs' two actions were consolidated for trial, the trial court entered two separate judgments and plaintiff filed two separate appeals. Plaintiffs successfully objected to consolidation of their appeals. Oral argument on the cases was consolidated, however, and we similarly have consolidated the cases for purposes of the opinion only.

the said Edgar Solle fails to install and maintain said cattle-guards * * *, and keep said road in repair, then and in that event the easement hereby created shall revert to and revest in the grantors, their heirs and assigns."

The easement in question is a one-lane dirt road that passes approximately one quarter mile over pasture land on defendants' property. Before this dispute, the easement had gates only at the front and rear boundaries of defendants' land (gates A and D, respectively). At the location of those gates, cattle guards also extend across the roadway.

Originally, the Modes used their property to raise sheep and cattle. In 1962, defendants Mary[2] and James Banducci purchased the Mode property and continued that use. Solle used his property primarily to grow prunes and grain and to raise some sheep. As he grew older, Solle stopped farming his land, later leasing it to defendant James, who extended his ranching operation there. In the late 1980s, James leased his land to his son, defendant Robert Banducci, who assumed the ranching duties and continued to raise livestock there and on the Solle property.

During the late 1970s and 1980s, defendants occasionally closed and locked gate A during the fall hunting season to keep hunters off the property; before that time, James had asked Solle for permission to lock it. Also, after a theft from the Solle home, the Solle estate once requested that James lock gate A for a period of time, the exact duration of which is not reflected in the record.

In March 1992, defendants' lease to ranch the Solle property ended and was not renewed. In the same month, Robert constructed gate B,[3] which is a short distance from

---

[2] Mary Banducci was a party to this case at trial, but she later died. Plaintiffs represented, and defendants did not dispute, that the nature of her interest here was such that the case could proceed without representation of her interests. We therefore entered an order acknowledging her death and dismissing her from these cases.

[3] As originally constructed, gates B and C were made of timber and thick metal wire. A person would close either gate by pulling its wires, which were attached to a board, tight across the road and by securing that board into loops of wire at the top and bottom of a fence post along the side of the road. Plaintiff James Watson testified that he, his family members, and employees were having difficulty opening and closing those gates; he therefore obtained permission from defendants to replace each gate with a swinging metal gate, which are the type of gates now there.

gate A and crosses the easement just beyond the driveway to James's and Mary's home. That gate is kept closed and locked. Sometime after constructing gate B, but before September 1992, Robert also installed gate C, which is farther down the easement roadway and serves to connect a natural fence of blackberry bushes on one side of the road to a constructed fence on the opposite side of the road. Gate C is closed occasionally, usually in conjunction with Robert working his livestock in that area. According to Robert, uninvited persons (mainly hunters) historically had entered both properties and the cattle guard at gate A had proven inadequate to keep all livestock at all times off the county road. He testified that he constructed both gates to control the movement of livestock on the property and to guard against trespassers.

On March 25, 1992, which was about the same time that James constructed Gate B, James and Mary recorded a memorandum of easement in an unsuccessful attempt to trigger the easement's reverter clause for lack of road and cattle guard maintenance.[4] They also sent a letter to the Solle estate, which stated, in part: "As you may be aware, we have locked the gate [B] on the roadway leading into Edgar Solle's property across our land. We did this to have some control on the access."

Around the same time, the Watsons became interested in purchasing the Solle property, eventually signing an earnest money agreement on May 7, 1992. Plaintiffs were not then aware of the memorandum of easement and the negotiated purchase price therefore did not reflect that cloud on the title of the Solle property. After becoming aware of the memorandum, however, plaintiffs renegotiated the sale, ultimately agreeing to a $25,000 reduction in price and to a more gradual payment schedule. Prior to completion of the sale, and on only one occasion, defendants refused to give a realtor for the Solle estate a key to unlock gate B. The deal closed on August 6, 1992.

That same day, James Watson went to his property. In attempting to leave, he found that gate B had been locked;

---

[1] Defendants and the Solle estate litigated whether the easement had in fact reverted and a trial court determined that it had not. We affirmed the trial court's decision without opinion. *Watson v. Banducci*, 138 Or App 188, 906 P2d 871 (1995).

to his memory, it had never been locked before. He was able to leave, however, because his farm manager, James Baraibar, cut the wood around the lock. Three weeks later, plaintiffs obtained a key for the lock at gate B, and since then, plaintiffs and defendants consistently have locked it.

In 1993, plaintiffs filed two actions in circuit court seeking monetary and injunctive relief for harm resulting from the events described above, which, essentially, center on defendants' alleged interference with the easement. The Solle estate assigned to plaintiffs the claims relating to events that occurred before their ownership of the Solle property: defendants' recording of the memorandum of easement; the letter notifying the Solle estate that gate B would be locked; the act of closing and locking gate B; and defendants' refusal to give the Solle estate's realtor a key. Plaintiffs filed an action on those claims separately from their other action, which they filed directly as owners of the Solle property and the attendant easement. That latter action included claims to enjoin the use of locks and internal gates on the easement. On defendants' motion, the two cases were consolidated for trial to the court.

After plaintiffs completed the presentation of their case-in-chief, defendants moved to dismiss the claims assigned to plaintiffs, contending that plaintiffs had failed to present any evidence that defendants' conduct before the sale constituted an actionable interference. *See* ORCP 54 B(2). The trial court granted defendants' motion. Defendants then presented their evidence on the remaining claims. After trial on those claims, the trial court entered the following judgment, declaring the following rights and obligations under the easement:

"A. Defendants may only lock one gate on the easement road at any given time, but all other gates may remain closed as necessary for reasonable agricultural purposes;

"B. Defendants may maintain the locked gate at location B and the gate at location C year round;

"C. Plaintiffs may replace the gates at locations B and C with electric gates together with cattle guards;

"D. In the event plaintiffs desire to replace the gates at locations B and C the gates and cattle guards are to be installed and maintained at plaintiffs' sole expense;

"E. Plaintiffs are obligated to maintain the easement road; and

"F. The speed limit along the easement road is 15 MPH."

On appeal, plaintiffs challenge the trial court's dismissal of the claims assigned to them by the Solle estate involving damages relating to defendants' recordation of the memorandum of easement and defendants' refusal to give access to the Solle estate's realtor. Plaintiffs also challenge the trial court's decision on the merits of their direct claims. Specifically, plaintiffs dispute the trial court's determination that under the easement, defendants may continue to use gates B and C and lock gate B, and the trial court's imposition of a 15 MPH speed limit along the easement roadway.

The basic question underlying all of plaintiffs' challenges on appeal is whether defendants' acts of closing gates B and C and of locking gate B violate the right granted to plaintiffs by the easement. Consequently, before addressing plaintiffs' discrete assignments of error, we first construe the express easement to determine if it precludes the use of internal gates and locks. The construction of the easement is a question of law. *Kell v. Oppenlander*, 154 Or App 422, 426, 961 P2d 861 (1998).

In construing an easement, our fundamental task is to discern the nature and scope of the easement's purpose and to give effect to that purpose in a practical manner. *Bernards et ux. v. Link and Haynes*, 199 Or 579, 593, 248 P2d 341 (1952), *on reh'g* 199 Or 579, 263 P2d 794 (1953). To determine an easement's purpose, "we look first to the words of the easement, viewing them in the context of the entire document." *Kell*, 154 Or App at 426. If those terms clearly express the easement's purpose, our analysis ends. *Tipperman v. Tsiastsos*, 327 Or 539, 544-45, 964 P2d 1015 (1998); *Kell*, 154 Or App at 426. If ambiguity remains, we look to relevant surrounding circumstances for evidence of the original parties' intent; relevant considerations may include the easement's purpose, the circumstances existing at the time of the grant, and the manner in which the original parties used the easement. *Tipperman*, 327 Or at 545; *Kell*, 154 Or App at 426.

■ In giving effect to an easement's purpose, general principles of reasonableness control. *Bernards*, 199 Or at 593. Ordinarily, an easement passes no rights to the grantee except those rights that are necessary for the easement's reasonable and proper enjoyment. *Miller v. Vaughn*, 8 Or 333, 336 (1880). Similarly, the grantor retains "full dominion and use of the land [subject to an easement], except so far as a limitation of the grantor's right is essential to the fair enjoyment" of the easement that was granted. *Id. See also Jones v. Edwards*, 219 Or 429, 434, 347 P2d 846 (1959); *Fendall v. Miller*, 99 Or 610, 616, 196 P 381 (1921); *Ericsson v. Braukman*, 111 Or App 57, 62, 824 P2d 1174, *rev den* 313 Or 210 (1992). The parties' respective rights of use and enjoyment are limited beyond those general principles only if the written document itself expressly and unequivocally imposes some greater restriction on or reservation of rights, or if extrinsic evidence shows that the original parties to the easement intended some further restriction of the parties' rights. *Jones*, 219 Or at 433; *Kell*, 154 Or App at 427-28.

■ The written easement here contains two material clauses: a purpose clause, which grants and defines the interest, and a reverter clause, which identifies the circumstances under which the interest granted may be lost. *See Kell*, 154 Or App at 426-27 (similarly characterizing the material clauses of an express easement). The purpose clause is in the easement's first sentence and is unequivocal. It describes the interest granted as *"an easement for a gateway road thirty (30) feet in width * * *."* (Emphasis added.) An easement, by definition, is a private right of way. *Hotchkiss v. Young*, 42 Or 446, 451, 71 P 324 (1903). *Accord* ORS 105.170(1). A gateway road, by definition, is a road that is crossed by gates. *Jones*, 219 Or at 436; *Fendall*, 99 Or at 617. Thus, the easement's purpose clause in simple, plain, and unambiguous terms granted Solle the right to use a private right of way on the Mode's property that would be gated in a manner consistent with the ordinary use of the surrounding land.

■ Despite the simplicity and straightforwardness of the interest granted, plaintiffs contend that the easement's reverter clause "specifically changed the normal understanding of the gateway road." The reverter clause comprises the easement's second paragraph and conditions the grant on Solle's installation and maintenance of effective cattle guards

at any line fence, as well as on Solle's maintenance of the easement roadway "for his use and the use of the public." Plaintiffs contend that the obligation to install cattle guards at the line fences and to maintain the roadway for the use of the public "shows that it is an easement for unimpeded access." Essentially, plaintiffs invite us to rely on the reverter clause to create an ambiguity in the easement's purpose clause.

We decline to do so. The problem with plaintiffs' contention is that the language they point to as expanding the easement's purpose, and the rights under it, was not made a part of the purpose clause, which is the operative provision creating and granting the easement. Instead, it was included in the reverter clause. To be sure, the language plaintiffs point to conditions the easement on the performance of certain obligations. However, given the unambiguous purpose clause, and the lack of any contrary extrinsic evidence of the *original* parties' intent, the language of the reverter clause is construed more reasonably as merely defining Solle's obligations under the easement, rather than expanding his rights of use. *See Jones*, 219 Or at 434 (when limitations on use of an easement are not clear, the easement should be construed as an ordinary easement).[5] Consequently, we hold that the Modes granted Solle an easement to use a private roadway subject to the inconvenience of reasonably *necessary* gates and that the parties' respective uses of that roadway are otherwise limited only by the general principles of reasonableness.[6]

---

[5] It is worth noting that the conditions in the reverter are sensible ways to adjust the obligations of the parties with respect to maintenance and other responsibilities involving the easement. For example, in the absence of an alternative agreement, a dominant estate owner ordinarily is obligated to bear the cost of maintenance only in proportion to his or her own use of the easement. *See* ORS 105.175. Thus, where, as here, neighbors agree to grant an easement for only minimal consideration (*e.g.*, one dollar), but in exchange want to impose on a grantee the costs of maintaining the easement as necessary for all who use it, a condition like the one in this reverter clause is a logical way to adjust that obligation. The same is true of the grantee's responsibility to maintain the cattle guards. Parties might well agree to something of that kind for the convenience of everyone concerned, and might further agree that the grantee, who is otherwise paying a minimal amount for the easement, should bear the cost. Imposing that responsibility on the grantee through a reverter clause is again a logical way to adjust the parties' obligations.

[6] Plaintiffs rely heavily on *Fendall*, 99 Or at 610, where the Supreme Court held that an easement's character as a public right of way altered the extent to

With that understanding of the nature of the easement, we turn to plaintiffs' assignments of error, addressing first the case involving plaintiffs' claims as owners. Plaintiffs contend, generally, that the trial court erred in failing to enjoin the closing of gates B and C and the locking of gate B, in imposing a 15 mph speed limit, and in declining to award them damages for defendants' conduct. We review *de novo,* ORS 19.415(3), and affirm.

■ Given our interpretation of the easement's purpose and scope as allowing internal gates, plaintiffs' first two assignments of error reduce to the question of whether defendants' use of gates and locks along the easement roadway was reasonable. Plaintiffs claim that "there is no demonstrated need for gate B[,]" for locking gate B, or for the existence of gate C. Defendants counter by asserting two justifications for the existence and use of gates B and C: (1) livestock management; and (2) to keep unwanted persons off the property.

We address only the first justification, because we find it dispositive. To prove that gates B and C, and the locking of gate B, are reasonably necessary, defendants relied on the testimony of Robert Banducci and of Buck Henry, a longtime rancher from the same area. Robert testified that cattle guards, in general, do not work effectively without gates:

"Any time [livestock] are crowded up close or if you wean calves or separate livestock that they will get in a position where they will try jumping them, sometimes they don't and they break legs, other times they jump them. Horses

---

which gates could be constructed and used. The language of the easement in *Fendall* differed in a material way from the language at issue in this case, and the difference serves to underscore why this case compels a contrary result.

In *Fendall,* the conveyance was of "a gateway to be used *as a road of public easement.*" *Fendall,* 99 Or at 613. The Supreme Court viewed the phrase "to be used as a road of public easement" as changing the traditional meaning of a "gateway" road and limiting the servient owner's right to construct additional gates along the roadway. *Id.* at 617-20. In contrast, the conveyance here was a grant of "an easement for a gateway road." As earlier discussed, an easement is, by definition, a private right of way unless otherwise qualified. Indeed, the parties agree in this case that the roadway is not a public way of passage and is instead limited to those members of the public who are invited by the parties to use it. Thus, because the purpose clause grants only a private way of access, and not a public one, the character of the easement provides no basis to disregard the traditional meaning of a gateway road.

are bad for just trying cattle guards because they get running and playing and they always end up in the cattle guard it seems like."

Buck Henry testified similarly. He stated that the construction of gates B and C, as well as the locking of gate B, served a reasonable ranching purpose of controlling the movement of livestock. Henry explained that the common practice in ranch management is for ranch owners to confine their livestock to certain areas with line fences and gates. He concluded that gates B and C were a reasonable and ordinary method to accomplish that purpose, basing his opinion on the configuration of defendants' outbuildings and the respective fence lines. Henry concluded that "[Robert] can turn in [those areas] and keep his livestock up close [to the outbuildings] or he can keep them out of the lot[s] if he wants * * *." Henry testified that it was reasonable to lock gate B because, in his experience, similar gates without locks "are mysteriously opened." Additionally, the evidence showed that Robert did not keep gate C closed, but rather closed it only in connection with his working of livestock in that area. The evidence of actual practice served to reinforce Henry's testimony of what would be reasonable given the layout of the ranch and general ranching practices in the area.

In short, defendants produced evidence to establish that the use of gates B and C and the locking of gate B is ordinary and within the range of reasonable agricultural and ranching choices. Plaintiffs, significantly, made no effort to contradict any of that evidence. Thus, to that extent, defendants' actions in constructing, using, and locking the gates were within what was contemplated by the grant of the easement for a gateway road.

The question remains whether the gates and the lock posed an unreasonable interference with plaintiffs' use and enjoyment of the easement. As to that inquiry, the burden rested with plaintiffs. *See Jones*, 219 Or at 435 (noting that the dominant estate owner had failed to show that certain gates "unreasonably interfered with their use of the easement"). In other words, plaintiffs were obligated to show that it is essential to their enjoyment of the easement that defendants not close gates B and C and not lock gate B. Plaintiffs

produced evidence that the gates caused some inconvenience to plaintiffs and persons visiting their property, in that they must stop, unlock, and open the gates to pass through, and then must reclose and relock the gates before proceeding. Inconvenience of that nature, however, was inherent in the grant of an easement for a gateway road—that is, a road that would be gated in a manner consistent with the ordinary use of the surrounding land. Because the easement expressly made plaintiffs' right to use the roadway subject to such inconveniences, they needed to show more. That is, they needed to establish that their "fair enjoyment" of the easement could not be achieved so long as defendants have and use the gates. *See, e.g., Jones*, 219 Or at 434-35. Plaintiffs did not meet that burden and the trial court properly declined to enjoin the use of gates B and C, or the locking of gate B.[7]

**11.** In an unrelated assignment of error, plaintiffs contend that the court erred "in setting a speed limit of 15 mph on the easement" because "there was no pleading bringing th[at] issue before the court and no testimony that dust was a problem and no[ ] testimony as to * * * a reasonable speed." The court's ruling was in response to an equitable counterclaim filed by defendants, in which they sought to prohibit plaintiffs from subdividing their land. Because defendants sought equitable relief, the court had wide latitude in fashioning an appropriate remedy. *See Day v. Griffith*, 283 Or 393, 403, 584 P2d 261 (1978) ("An equity court has substantial powers to fashion appropriate remedies."). *See also Horton v. Whitehill*, 121 Or App 336, 340, 854 P2d 977, *rev den* 318 Or 25 (1993) ("[A] court sitting in equity has the power to fashion the remedy it deems necessary and appropriate under the circumstances."). Here, the trial court declined to grant defendants' requested relief, instead declaring that "[p]laintiffs may use the easement road more severely and intensively than the easement was used in 1947." Given that ruling, the court then imposed a 15 mph speed limit on the easement. Because the evidence showed that the roadway passes through open pasture and occasionally has livestock

---

[7] In a related assignment of error, plaintiffs argue that if "either gates or the locks are found to be not allowed[,] [plaintiffs] are entitled to damages." Given our conclusion that the trial court properly did not enjoin the use or the locking of the gates, there is no basis for an award of damages in that regard.

on it, and that it is unpaved and oftentimes muddy, the court fashioned a remedy reasonably accommodating both defendants' reasonable use and enjoyment of their land and plaintiffs' desire to increase the intensity of their use of the roadway. We find no error.

In plaintiffs' case involving the claims assigned to them by the Solle estate, they argue that the trial court erred in dismissing those claims when it held that the facts and the law did not establish any right to relief. ORCP 54 B(2). Specifically, plaintiffs argue that any of four claims of interference with the easement, if believed by a factfinder, would be a basis for damages: (1) recording a memorandum of easement claiming the easement had reverted; (2) informing the Solle estate by letter that gate B would be locked; (3) locking gate B; and (4) denying the Solle estate's realtor a key to open gate B on one occasion. In reviewing the trial court's dismissal, we consider the whole record to determine whether there is any evidence sufficient to make a *prima facie* case, keeping in mind that motions under ORCP 54 B(2) are to be "sparingly granted." *Gildow v. Smith*, 153 Or App 648, 652, 957 P2d 199 (1998).

An action for interference with an easement requires a showing of a substantial interference with the grantee's right to use the easement, *Landauer v. Steelman*, 275 Or 135, 141, 549 P2d 1256 (1976); *Marsh v. Pullen*, 50 Or App 405, 409, 623 P2d 1078, *rev den* 290 Or 853 (1981), which, in turn, requires some showing that the grantee's use was actually damaged by the alleged interference. *See Landauer*, 275 Or at 139-40 (the defendant confronted plaintiff's guests, telling them that they could not use the easement). *See also Marsh*, 50 Or App at 409 (record showed that "on several occasions plaintiffs or their guests had to maneuver around parked cars to travel down the [easement] or had to request that certain cars be moved to permit passage along the road."). Here, plaintiffs allege only one act of *actual* interference—*viz.*, defendants' refusal to give a key to the Solle estate's realtor. Although the other allegations tend to suggest an effort to interfere, they do not assert any actual interference with the Solle estate's use of the easement and, thus, they do not, without more, provide a basis for an actionable claim of interference.

■ However, the realtor incident, if believed by a jury, could support a finding of substantial interference with the estate's use of the easement. Whether an interference is substantial turns on whether defendants' conduct deprived the Solle estate of a degree of use to which they were entitled by the easement. *Marsh*, 50 Or App at 409. In *Landauer* and *Marsh*, because the easements granted unrestricted use, conduct that merely made passage on the easement more difficult sufficed. *Landauer*, 275 Or at 139-41; *Marsh*, 50 Or App at 409. Here, the easement entitled Solle and his guests to use of the roadway subject to the inconvenience of opening and closing gates. Defendants' conduct in this instance resulted in more than that inherent inconvenience; it was a complete prohibition on any use of the roadway, at least on that occasion and for that particular invitee of the Solle estate. The trial court erred in dismissing plaintiffs' assigned claim insofar as that allegation of interference was concerned.

Affirmed in CA A97433; reversed in CA A98289.