**CAL–NEVA LAND & TIMBER INC;**
**Thomas G. Atwood, Plaintiffs,**

v.

**The UNITED STATES of America; Bureau of Land Management, an Agency of the United States Department of the Interior; Bruce Babbitt, Secretary of the Interior; Sylvia Baca, Acting Director of the Bureau of Land Management; Elaine Y. Zielinski, Director of the Bureau of Land Management for the State of Oregon; Harry M. Cosgriffe, Central Oregon Area**

BLM Manager; Friends of Rudio Mountain, Inc., an Oregon Corporation; Jamie R. Kidwell; Julie A. Kidwell; Merle Kidwell; and Kathleen Kidwell, Defendants and Counterclaimants.

No. CV–97–889–HU.

United States District Court,
D. Oregon.

Sept. 30, 1999.

Mark C. Hoyt, Salem, OR, for Plaintiffs.

Kristine Olson, United States Attorney, Portland, OR Thomas C. Lee, Assistant United States Attorney, Portland, OR, Roger W. Nesbit, Special Assistant United States Attorney Office of the Regional Solicitor, Portland, OR, for Defendants United States, Bureau of Land Management, Bruce Babbit, Sylvia Baca, Elaine Y. Zielinski, Harry R. Cosgriffe.

Ivan J. Vesely, Portland, OR, for Defendants Friends of Rudio Mountain, Jamie R. Kidwell, and Julie A. Kidwell.

Merle Kidwell, Forest Grove, OR, pro se.

Kathleen Kidwell, Forest Grove, OR, pro se.

HUBEL, United States Magistrate Judge.

Plaintiffs Cal–Neva Land & Timber and Thomas G. Atwood bring this action against the United States and its administrative agency the Bureau of Land Management (BLM) as well as private defendants Friends of Rudio Mountain and four members of the Kidwell family. The dispute arises from a grant by plaintiffs' predecessor-in-interest to the BLM of an easement over private land in Eastern Oregon. · In their Amended Complaint, plaintiffs contend that defendants breached the easement agreement. Plaintiffs also seek to quiet title to the easement property.

The government defendants bring identical claims against plaintiffs.

At this stage of the litigation, the only motions fully briefed and ready for decision are plaintiffs' motion for summary judgment on their claims against the government defendants and the government's motion for summary judgment on its counterclaims against plaintiffs.[1] I grant the government's cross-motion for summary judgment and deny plaintiff's motion for summary judgment.

## BACKGROUND

■ Unless noted otherwise, the following facts are undisputed. On June 10, 1957, the BLM acquired an easement from Henry and Hazel Dixon and another from Walter Weise. The Dixons and Weise owned ranch property in Eastern Oregon. The Dixon property has been known over the years as the "W4 Ranch," the "Sam Bar Ranch" and presently as the "Longview Ranch." The property subject to the easements is limited to what is commonly known as Holmes Creek Road (HCR). HCR leads to both public and private lands on Rudio Mountain. The Dixon and Weise easements are defendants' sole written recorded interest in HCR and represent the entire written agreement between the grantees and the grantors regarding HCR.[2]

HCR was first constructed in either 1947 or 1948 by the Waldorf family, predecessor-in-interest to the Dixons. Before construction, HCR was a livestock trail.

HCR was built by a logging company pursuant to a logging contract with the Waldorfs. Initially, it was narrow, steep, and mostly dirt and was used to haul logs. While the Waldorfs owned the ranch, they put in fencing near or along the road to keep cattle from a nearby ridge. They also constructed a gate on HCR.

At some point, the Waldorfs sold the ranch property to the Dixons. BLM employee Richard Ulrich negotiated the easements with the Dixons and Weise on behalf of the BLM. Ulrich is the only BLM representative to have discussed the easements with the grantors. At the time the easements were negotiated, Ulrich had no personal knowledge of the public use of HCR.

Ulrich has no recollection of advising the Dixons or Weise that the public would have access across their property or that HCR would be considered a public road. According to Ulrich, the purpose of obtaining the easements was to gain access to BLM timber. However, Ulrich states, the easements did more than "quote timber." They were used for the administration of BLM lands, could be used for inventory, and "could be for a whole variety of purposes." Ulrich Depo. at p. 21. Ulrich does not remember discussing these additional purposes with the Dixons.

· Both the Dixons and Weise granted a "perpetual easement and right-of-way, including but not limited to the right and privilege to locate, construct, relocate,

---

1. I have considered all of the arguments raised in these two motions except for the argument raised by the government in passing during oral argument regarding the statute of limitations applicable to plaintiffs' quiet title claim. Because that argument was not raised in the government's briefs, nor identified as an affirmative defense in the government's Answer, I will not consider it.

2. Although there is no express integration clause in the easements and although the parties themselves do not use the term "integrated" in describing the easements, neither party asserts that the easements are not integrated writings. "Whether parties to a writing in-

tended it to be an integrated agreement is a question of fact for the court." *Abercrombie v. Hayden Corp.*, 320 Or. 279, 288, 883 P.2d 845, 850 (1994). "An integrated agreement is one that the parties intended to be a final expression of some or all of the terms of the agreement." *Id.* "A completely integrated writing is one that the parties intended to be the final and exclusive expression of their agreement." *Id.* at 288, 883 P.2d at 851. Here, having examined the easements and the relevant extrinsic evidence, I conclude that the easements are completely integrated writings.

maintain, control, and repair a roadway ..." Administrative Record (AR) Exhs. 11, 12. After the legal description of the property, the easements state that "[t]he rights and privileges granted herein are for the full use as a roadway by the Grantee, its licensees and permittees." *Id.* Each easement was granted for $1.00 in consideration.

In the Weise easement, there are three reservations: (1) the first purchaser of government timber who elected to use the road or rights of way covered by the easement was required to pay Weise $200 before transporting the logs; (2) Weise reserved the right to approve the location of any new roads constructed across the property; and (3) the purchaser of government timber was required to immediately repair any damage to irrigation ditches, fences, gates, and cattle guards, caused by the transportation of logs.

There were also three reservations in the Dixon easement, the first two of which mirrored the last two reservations of the Weise easement. The last reservation in the Dixon easement required the purchaser of government timber to leave roads in a usable condition at the completion of logging operations to the satisfaction of the Officer in Charge.

Both the Dixon and Weise easements were obtained using BLM easement Form A1–215. In 1958, the Regional Solicitor's Office concluded that easements obtained under this form could be interpreted as allowing public access but recommended that the BLM revise the easement form to make the point clear. The BLM later did so.

Generally, undisputed testimony from several witnesses familiar with HCR establishes that from 1957 until 1981, any gates on HCR were unlocked and access by the public occurred regularly. In 1981, Leonard Breck and his son Bobb became managers of the ranch. Leonard Breck

states that in 1981, the ranch property was posted with no trespassing signs, including at the spot where HCR meets Highway 19. Beginning in 1981, Leonard Breck began locking the gate during hunting season, but not at other times of the year. In 1991, Leonard Breck began to lock the HCR gate year-round. At that time, the BLM cited Breck for locking the gate when he refused to remove the lock in response to the BLM's demand to do so.

The BLM did not pursue the citation after the Regional Solicitor issued a 1992 opinion concluding that the Dixon and Weise easements did not grant the BLM the authority to allow public access. Later, in 1997, the Regional Solicitor reversed its opinion and concluded that given the existing use of the road by the public at the time the easements were granted, if the parties did not intend the public to have use of the improved road to be constructed by the BLM under the easement, that intention would have been made explicit in the document.[3]

Based on the revised 1997 Regional Solicitor opinion, the BLM demanded that the locks be removed from the gate and that HCR be opened to the public. Plaintiffs have refused to do so. This litigation ensued.

## STANDARDS

The court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does

---

**3.** The Regional Solicitor's opinions are not controlling and neither plaintiffs nor the government argue that they are. Such opinions

are little more than any advice or opinion rendered by an attorney to his or her client.

not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court should resolve reasonable doubts about the existence of a material factual issue against the moving party. *Id.* at 631. The court should view inferences drawn from the facts in the light most favorable to the nonmoving party. *Id.* at 630–31.

## DISCUSSION

### I. Standards for Interpreting Easements

■ "The interpretation of an express easement, like that of contracts and other written instruments, is a question of law for the court." *Kell v. Oppenlander*, 154 Or.App. 422, 426, 961 P.2d 861, 863 (1998) (citing *State Highway Comm'n v. Deal*, 191 Or. 661, 681–82, 233 P.2d 242, 251 (1951); Oregon Revised Statute (ORS) 42.230).

■ "In construing an easement, [the court's] fundamental task is to discern the nature and scope of the easement's purpose and to give effect to that purpose in a practical manner." *Watson v. Banducci*, 158 Or.App. 223, 230, 973 P.2d 395, 400 (1999) (citing *Bernards v. Link*, 199 Or. 579, 593, 248 P.2d 341, 347 (1952)). "To determine an easement's purpose [the court] 'look[s] first to the words of the easement, viewing them in the context of the entire document.'" *Id.* (quoting *Kell*, 154 Or.App. at 426, 961 P.2d at 863). Words in the grant of an easement are given their plain, ordinary meaning. *Fendall v. Miller*, 99 Or. 610, 616–17, 196 P. 381, 383 (1921). If the easement's terms clearly express the easement's purpose, the analysis ends here. *Watson*, 158 Or. App. at 230, 973 P.2d at 400.

■ "If ambiguity remains, [the court] look[s] to relevant surrounding circumstances for evidence of the original parties' intent[.]" *Id.* "[R]elevant considerations may include the easement's purpose, the circumstances existing at the time of the grant, and the manner in which the original parties used the easement." *Id.*

■ "In giving effect to an easement's purpose, general principles of reasonableness control." *Id.* at 231, 973 P.2d at 400. "Ordinarily, an easement passes no rights to the grantee except those rights that are necessary for the easement's reasonable and proper enjoyment." *Id.* The grantor retains "'full dominion and use of the land [subject to an easement], except so far as a limitation of the grantor's right is essential to the fair enjoyment' of the easement that was granted." *Id.* (quoting *Miller v. Vaughn*, 8 Or. 333, 336 (1880))(brackets in *Watson*). Additionally,

[t]he parties' respective rights of use and enjoyment are limited beyond those general principles only 'if the written document itself expressly and unequivocally imposes some greater restriction on or reservation of rights, or if extrinsic evidence shows that the original parties to the easement intended some further restriction of the parties' rights.

*Id.*

■ If the easement is not specifically defined, "the rule is that it need be only such as is reasonably necessary and convenient for the purposes for which it was created." *Fendall*, 99 Or. at 615, 196 P. at 383. "The servient estate will not be burdened to a greater extent than was contemplated or intended at the time of the creation of the easement." *Id.* However,

[t]o restrict an easement grantee's use, the Supreme Court requires express language clearly imposing a use limitation or extrinsic evidence that the parties so intended. *Jones v. Edwards*, 219 Or. 429, 433–35, 347 P.2d 846 (1959).

Where the language is equivocal and there is no evidence or only scant evidence of what the parties intended, ... the Supreme Court gives an easement its ordinary scope, permitting the use reasonably to change with changing needs. *Id.*

*Kell,* 154 Or.App. at 428, 961 P.2d at 864.

██ Finally, "if an easement is granted in general and unlimited terms, unrestricted reasonable use will be deemed to be intended by the parties without the need for an affirmative recitation of every conceivable use that is allowed." *Criterion Interests, Inc. v. Deschutes Club,* 136 Or. App. 239, 245, 902 P.2d 110, 113, *modified,* 137 Or.App. 312, 903 P.2d 421 (1995).

II.  Words of Easements—Determining Scope and Purpose

██ The easements are devoid of any reference to the public. Plaintiffs argue that because the words "public" or "recreationist" or other synonyms are absent from the easements, the easements unambiguously fail to grant to the BLM the right to open HCR to public use. The government maintains that because the easements do not specifically exclude public access, and because the easements expressly grant the BLM the right to "control" a roadway and give the BLM, its licensees, and permittees the "full use" of a roadway, the easements give the BLM the right to allow public access on HCR. For the reasons explained below, I agree with the government that the plain language of the easements unambiguously gives the BLM the right to allow public access.

The analysis starts with any express purpose or use language in the documents. The grantors granted to the BLM a "perpetual easement and right-of-way, including but not limited to the right and privilege to locate, construct, relocate, maintain, control, and repair a roadway" over and across their real property. With this language, the purposes of the easements included construction and other activities related to a roadway. However,

because of the additional "including but not limited to" language, the purposes are expressly unrestricted.

With unlimited purposes come unlimited uses. Additionally, here, even as to the roadway, the one purpose expressly stated, there are no express restrictions on its use. For example, there is no mention of restricting the use of a roadway to logging, grazing, administration of BLM lands, or fire protection. In fact, as the government notes, the easements expressly grant the BLM, its licensees, and permittees "full use" of the roadway.

██ The reservation sections of the easements suggest that the parties clearly contemplated that the road would be used for logging activities. Again, however, while this one use is identified, nothing in the documents suggests that logging was intended as the exclusive use.

██ In addition to a grant of unlimited purposes and "full" unrestricted uses, the easements also give the BLM "control" of the road. During oral argument, plaintiffs argued that because "control" followed a list of words related to the surface of a road, control should be limited to the road surface as well. Although the maxim relied on by plaintiffs is well-established, nothing in the easements supports plaintiffs' proposed construction. The words preceding "control" allow the grantee to locate, construct, and maintain a road. The next word, "control," is more logically interpreted as the authority given to the grantee for operation of the road, once it is located, constructed, and properly maintained. *See Yogman v. Parrott,* 325 Or. 358, 361, 937 P.2d 1019, 1021 (1997) (court examines text of provision in the context of the document as a whole). Thus, as the government suggests, the word "control" gives the BLM the right to regulate, govern, administer, and oversee the road after it has been located and constructed.

In summary, the plain language of the easements contains no express restrictions

on either the purposes or the uses of the easements. The roadway's unrestricted use is underscored by the grantors giving the grantee "control" and "full use" of the roadway.

■ For the government to succeed in its argument, however, the words "licensees" and "permittees" must be understood, in their plain meaning, as including the public. The government maintains that the term "licensees" includes the public as implied licensees. Plaintiffs contend that the term is limited to those using the road for logging or grazing activities.

The easements do not define "licensees" or "permittees" and do not refer to any regulations defining the terms. In construing the terms according to their plain meaning, I agree with the conclusion reached by the Regional Solicitor in its December 31, 1958 Opinion Letter that the words "licensees and permittees" are broad enough to include recreationists. AR 30 at 133–34 (citing definitions of express license and implied license from Black's Law Dictionary (4th ed.1951)); *see also United States v. Curtis–Nevada Mines, Inc.*, 611 F.2d 1277, 1283 (9th Cir. 1980) (describing historical use by general public of the United States's public domain for recreation and other purposes as access under an implied license).

Plaintiffs suggest that regulations operative in 1957 defined licensee as "any person who is authorized to remove timber or forest products from lands of the United States[.]" AR 15 at p. 56 (copy of BLM Manual effective June 28, 1957); *see also* AR 238 at p. 2193 (copy of 43 C.F.R. § 2812.0–5(h) (1972)) (same definition). But, as noted above, the easements themselves do not refer to the definition from the BLM Manual or the regulation. Additionally, it is apparent that the definitions contained in the Manual and the regulation concern reciprocal right-of-way agreements negotiated with timberland owners in the checkerboard ownership of O & C lands in Western Oregon. *Id.* (BLM Manual states that it contains interpretations and procedural guides for O & C right-of-way regulations; 43 C.F.R. § 2812.0–5(h) is in subpart 2812 pertaining to "O and C and Coos Bay Revested Lands.").

While the BLM, in certain right-of-way agreements, may have used the term "licensee" to refer only to those removing timber or other forest products from public lands, nothing on the face of these easements so restricts the definition of "licensees" and there are no apparent controlling regulations supplying such a restricted definition. Similarly, while Ulrich states that the terms "licensees and permittees" "would be used [to refer to] the cattle people that had access to grazing rights on BLM lands[,]" Ulrich Depo. at p. 22, nothing on the face of the easements restricts the definition of "licensees" to those with grazing rights and Ulrich did not state that the terms in these easements were so restricted. In fact, Ulrich testified that at the time, he had no knowledge of whether BLM grazing land even existed up HCR. *Id.* The Ulrich testimony simply identifies a second use, of many possible uses, that a licensee may make of the premises.

With unrestricted purposes and uses clearly evidenced by the plain language, there is no need to look at which BLM licensees and permittees may use HCR for which purpose. Because the terms "licensees and permittees" under their plain meaning include the public as implied licensees, A.R. 30 at 133–34; *Curtis–Nevada Mines*, 611 F.2d at 1283, the easements grant the BLM the authority to allow the public to use HCR to access public lands further up Rudio Mountain.

*Criterion Interests* is a particularly relevant case. Although the language of the easements at issue there is distinguishable, the court's analysis is instructive. In that case, the defendant argued that the absence of any language in the easement describing the permissible uses of the easement created an ambiguity requiring the court to consider the testimony of the

parties to the easement regarding the intended, limited use. Although the court noted that it may consider parol and other extrinsic evidence in determining whether the terms of an agreement are ambiguous, *Criterion Interests*, 136 Or.App. at 243, 902 P.2d 110 (citing *Abercrombie*, 320 Or. at 292, 883 P.2d at 853),[4] it explained that the application of that rule is limited by other rules of statutory construction, including that every word should be given effect and that unambiguous, integrated writings cannot be contradicted by parol evidence. *Id.* at 244–45, 902 P.2d 110. The court rejected the defendant's argument that the absence of any language in the easement describing the permissible uses of the easement created an ambiguity. *Id.* Instead, the court held that "if an easement is granted in general and unlimited terms, unrestricted reasonable use will be deemed to be intended by the parties without the need for an affirmative recitation of every conceivable use that is allowed." *Id.* at 245, 902 P.2d 110. In construing the easement at issue, the court agreed with the defendant that the use permitted by the easement was limited to access but, the court noted, "the purposes

for which the grantee may invoke its right to access were unambiguously left unrestricted." *Id.* at 246, 902 P.2d 110.

Additionally, the court rejected the defendant's argument that the evidence of the circumstances at the time the easement was executed, specifically evidence of the parties' intention at that time, created an ambiguity. *Id.* at 246, 902 P.2d 110. Rather, the court stated that it could not "'insert what has been omitted or omit what has been inserted.'" *Id.* (quoting ORS 42.230). The court continued: "Evidence of the circumstances under which an agreement is made that is indicative of the parties' intent may only affect the interpretation of the agreement when there is language in the agreement that is susceptible to being construed to carry out that intent." *Id.*

Plaintiffs attempt to distinguish *Criterion Interests* on the basis that the easements at issue there expressly excluded the public. While that is true, plaintiffs do not address the court's analysis which is relevant independent of the distinction plaintiffs point out.

**4.** Although *Abercrombie* has not been expressly overruled, subsequent Oregon Supreme Court and Oregon Court of Appeals cases have not consistently followed its conclusion that extrinsic evidence may be considered in determining whether an ambiguity exists, as opposed to considering such evidence to determine the parties' intent only after an ambiguity is apparent from the four corners of the document. *See, e.g., Yogman,* 325 Or. at 361, 363, 364, 937 P.2d at 1021, 1022 (court uses three steps to interpret a contractual provision: (1) examining the text of the provision in the context of the document as a whole; (2) if the provision is ambiguous, the court examines extrinsic evidence to determine the parties' intent; and (3) if ambiguity remains after such examination, the court will use appropriate maxims of construction); *Roe v. Doe,* 161 Or.App. 477, 984 P.2d 344, 349 (1999) (in construing a contractual provision, the court first looks at the text of disputed provision in the context of the document as a whole and next, "if, but only if, an ambiguity exists, we 'examine extrinsic evidence[.]'") (quoting *Yogman,* 325 Or. at 363, 937 P.2d at 1022); *see also Hoffman Constr. Co. of Alaska v. Fred*

*S. James & Co. of Or.,* 313 Or. 464, 470, 836 P.2d 703, 706 (1992) (determining whether undefined term in insurance contract was ambiguous first from its plain meaning and next from its context in the policy and the broader context of the policy as a whole); *accord Groshong v. Mutual of Enumclaw Ins. Co.,* 329 Or. 303, 985 P.2d 1284, 1286 (1999) (applying analysis from *Hoffman*); *Schiffer v. United Grocers, Inc.,* 329 Or. 86, ——, 1999 WL 498175, at *9 (1999) (citing *Hoffman* as stating Oregon's rules for interpretation of contracts generally).

Here, as the discussion in the following section makes clear, even if I were to follow *Abercrombie* and examine the extrinsic evidence to determine whether the easements are ambiguous as opposed to examining such evidence only after determining that they are indeed ambiguous, I conclude that there is no conflict between the parties' intent as seen in the extrinsic evidence and the clear and unambiguous words used to express that intent in the documents. Thus, the extrinsic evidence does not create an ambiguity in the easements.

Here, as in *Criterion Interests,* the "purposes for which the [BLM] may invoke its right to access are unambiguously left unrestricted." In addition, here, in contrast to the easement in *Criterion Interests* which had a limited use (access), the uses to which the BLM may put the property are also "umambiguously left unrestricted." Furthermore, as in *Criterion Interests,* because the easements at issue here are "granted in general and unlimited terms," "unrestricted reasonable use will be deemed to be intended ·by the parties without the need for an affirmative recitation of every conceivable use that is allowed." Finally, as in *Criterion Interests,* because no language in the easements at issue here limits their purposes or uses, they are not susceptible to a contrary interpretation and thus, "[e]vidence of the circumstances under which [the] agreement [was] made that is indicative of the parties' intent[,]" is not properly considered.

In summary, the absence of express permissible uses does not create an ambiguity. The easements contain no restrictions on purpose or use. Rather, the easements granted the BLM "full use" and "control" of the roadway. Although a roadway was *a* stated purpose, it was not exclusive. Although logging was clearly *a* contemplated use of the roadway, it was not an exclusive use. Additionally, when "licensee and permittees" are given their ordinary, plain meaning, the term includes the public as implied licensees. Under *Criterion Interests,* the easements present an unambiguous unrestricted grant to the BLM including the right to allow public access to HCR. *See also Yogman,* 325 Or. at 361, 363, 937 P.2d 1019. III. Extrinsic Evidence of Intent

■ Alternatively, if the easements were deemed ambiguous, making the consideration of parol and extrinsic evidence to determine the parties' intent appropriate, I conclude that such evidence supports the government's argument that it may allow the public to access HCR. The following discussion of the extrinsic evidence and this alternative holding is not intended to suggest that I find ambiguity in the easements. I do not. I include the discussion out of an abundance of caution so that if a reviewing court disagrees with my conclusion that the easements are unambiguous,[5] the parties need not return to this Court on remand to re-present evidence and argument on the interpretation of the extrinsic evidence.

**A. Evidence From Parties to Easements**

There is no evidence from either of the grantors regarding their intended purpose. As stated above, Ulrich did not know what the public use of HCR was at the time of the easements. He has no recollection of advising either Weise or the Dixons that the access road easements would include the rights of the public to cross the property. He does state, however, that it was common knowledge at the time that BLM-constructed or controlled roads were open to the public, and that the easements could be used for a variety of purposes. Ulrich Depo. at pp. 21, 26–27.

**B. Evidence From Other Persons—1946—1981**

James Waldorf, who lived on the ranch as a boy from 1946 to 1955, states that his father posted and patrolled the ranch property. Waldorf Depo. at p. 15. He also states that people obtained permission to go "up there" usually by calling his father. *Id.* His family posted their private property along the road with "No Trespassing" signs. *Id.* at p. 34.

Gibb Gregg's family leased a house from the Waldorfs. Gregg states that he had permission to hunt on the ranch property and that everyone asked permission to use the property, including Gregg's father. Gregg Depo. at p. 12, 17–18. Gregg ob-

**5.** Both parties have mentioned appeal should they be unsuccessful here.

served a logger ask Art Waldorf for permission to cut wood. *Id.* at p. 17.

Frank Miller began using HCR in 1952 and was never challenged in his use of the road. Miller Depo. at pp. 8, 12. His use of the road was always unobstructed. *Id.* at p. 22.

Bill Thomas has used HCR "hundreds" of times since 1952. Thomas Depo. at p. 6. At some point, Thomas asked Howard Gable, manager of the W4 ranch beginning in 1962, for permission to use HCR. *Id.* at p. 13. As Thomas explained, he "asked if [he] could go up there and hunt or just go there on top of the hill." *Id.* Thomas was unaware of Gable ever blocking off the road. *Id.* at p. 20. Thomas assumed that HCR was a public road, but sought permission from the ranch owner to hunt and recreate because "[j]ust because [the] public has a right to use the road, you can't go on someone's private land without asking permission." *Id.* at p. 22.

Earl Weatherford's family owned the neighboring ranch which Weatherford ran from 1954 to 1985. He used HCR from 1959 through the 1980's. Weatherford Depo. at p. 11. He never sought permission to use the road and did not encounter any locked gates. *Id.* at p. 12. He never gave notice to Gable that he was using HCR. *Id.* at p. 17.

Johnny Shaw became familiar with HCR in 1968 when he worked for a timber company conducting logging operations on Rudio Mountain. He has hunted there every year from 1968 and until 1992, he never asked permission from the ranch owners or managers to do so. Shaw Depo. at pp. 13, 23–24. Until 1992, he did not find any locked gates. *Id.* at p. 33.

Finally, Gable allowed hunters and other recreationists access to private ranch property with permission. Gable Affid. at ¶ 3. As he explained in his Affidavit:

> [I]t was my practice to allow hunters and recreationalists access to the public land on the east side of the ranch, including access up Holmes Creek Road.

> To my knowledge, approximately 90% of the people would ask permission to use Holmes Creek Road and such permission would be granted. I would direct them where to hunt and camp.

*Id.* at ¶ 4.

Plaintiffs argue that the evidence of use of HCR shows that public use occurred only with permission and thus, the parties to the easement did not intend to give the BLM the right to allow unrestricted non-permissive public use. A careful reading of the affidavits and deposition testimony, however, indicates that first, where permission was sought it was for hunting and other recreational activities on private ranch lands up on Rudio Mountain and not limited to use of HCR itself as a means of accessing public lands, and second, that many people used HCR to access public and private lands up on Rudio Mountain without obtaining permission.

For example, Jim Waldorf's testimony notes that his father posted and patrolled the ranch property and that people obtained permission to go "up there." His testimony does not support a conclusion that permission was required to use the road itself. Additionally, his family's posting of their property along the road with "No Trespassing" signs indicates that they expected members of the public to use the road, but to stay off of the land adjacent to the road. *See also* Shaw Depo. at p. 25 (no trespassing signs regarding property would not mean anything to him about rights on the road).

Gregg's and Thomas's testimony is also best understood as describing permission to access ranch lands up the mountain, not permission to use only the road. Even Gable's statement that people were asking permission to use HCR, when examined in the context of the rest of his testimony, indicates that he was discussing permission to use ranch lands further up the mountain for hunting and other recreational pursuits.

Thus, the extrinsic evidence establishes that non-permissive public use of HCR occurred before and well after the easements were granted. Given such evidence, the status quo at the time the easements were granted was that HCR was burdened with public use and that permission was required, if at all, only for hunting and other activities on the private ranch lands up Rudio Mountain adjacent to HCR. With such a status quo, the fact that the easements grant the BLM unrestricted purposes and uses of the easement property indicates that the parties intended the status quo to continue. Additionally, the continuation of the status quo for twenty-four years after the easements were granted is persuasive evidence that no intent to exclude the public from HCR existed.

C.  Evidence From Other Persons—Post–1981

■ Plaintiffs rely on the affidavits of the Brecks who have been managers of the ranch since 1981. The Brecks have been locking the gate during hunting season since 1981 and have locked it year-round since 1991. According to the Brecks, the BLM failed to object to their practice of locking the gate until 1991 and the BLM itself has participated in maintaining their own BLM locks on the gate since 1981.

■ Extrinsic evidence, as indicated above, is considered to assist the court in determining the intent of the original parties to the easements. The extrinsic evidence cited in the previous section establishes that the parties intended the easements to grant the BLM the right to allow public use. Because the Brecks' testimony concerns events beginning twenty-four years after the grant of the easements, it is not helpful to understanding the parties' intent. Rather, the Brecks' testimony simply shows that since 1981, they have taken actions inconsistent with the BLM's rights. It is immaterial that at times the BLM may also have locked the road. As the grantee of an easement with unrestricted purposes and uses, the BLM was entitled to do so,

as long as it did not unreasonably burden the servient estate. But, if the BLM later decided to allow public use of HCR, the Brecks' maintenance of locks on the road after that point interferes with the BLM's rights.

In summary, the extrinsic evidence establishes a long history of public use of HCR both before and after the grant of the easements. In contrast to the public use of private ranch lands further up the mountain which were generally accessed with permission, the public use of HCR itself was non-permissive. Thus, the fact that the easements were unrestricted and did not exclude public access, indicates that the parties intended to preserve the status quo and give the BLM the right to allow public use of HCR to access public lands on Rudio Mountain.

## CONCLUSION

Defendants' motion for summary judgment on its counterclaims (# 62) is granted. Plaintiffs' motion for summary judgment against the government defendants (# 71) is denied.

IT IS SO ORDERED.